PEOPLE v PICKENS

PEOPLE v WALLACE

Docket Nos. 91434, 95720. Argued December 2, 1993 (Calendar Nos. 9-10). Decided August 25, 1994. Rehearing denied in *Wallace,* 447 Mich 1202.

Dwayne Pickens was convicted by a jury in the Detroit Recorder's Court, Warfield Moore, Jr., of selling less than fifty grams of cocaine. The Court of Appeals, MURPHY, P.J., and CAVANAGH and CONNOR, JJ., in an unpublished opinion per curiam, remanded the case for an evidentiary hearing regarding the ineffectiveness of defense counsel in failing to file a notice of an alibi witness (Docket No. 115477). On remand, the Recorder's Court conducted the evidentiary hearing pursuant to *People v Ginther,* 390 Mich 436 (1973). After remand, the Court of Appeals reversed in an unpublished opinion per curiam, concluding that the defendant was prejudiced by his counsel's failure (Docket No. 115477). The people appeal.

Ralph Wallace was convicted by a jury in the Detroit Recorder's Court, Edward M. Thomas, J., of the first-degree murder of his wife and of possession of a firearm during the commission of a felony. The Court of Appeals, WAHLS, P.J., and GILLIS and SULLIVAN, JJ., ordered the case remanded for a *Ginther* hearing with regard to the defendant's claim of ineffective assistance of counsel (Docket No. 102225). On remand, the Recorder's Court conducted an evidentiary hearing. After remand, the Court of Appeals, GRIBBS, P.J., and CAVANAGH and MARILYN J. KELLY, JJ., affirmed in an unpublished opinion per curiam (Docket No. 102225). The defendant appeals.

In an opinion by Justice RILEY, joined by Justices BRICKLEY, BOYLE, and GRIFFIN, the Supreme Court *held:*

The intention underlying the Michigan Constitution does not afford greater protection than federal precedent with regard to a defendant's right to counsel when it involves a claim of

REFERENCES

Am Jur 2d, Criminal Law §§ 752, 753, 984-987.

Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.

ineffective assistance of counsel. To find that the right to effective assistance of counsel was so undermined as to justify reversal of an otherwise valid conviction, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that the representation so prejudiced the defendant as to deprive the defendant of a fair trial.

1. *People v Garcia,* 398 Mich 250 (1976), which required reversal of a criminal conviction when defense counsel failed to perform as well as a reasonably competent attorney, even if the defendant was not prejudiced by the representation, essentially relied on Sixth and Fourteenth Amendment jurisprudence, and did not formulate its standard on the basis of the intentions, history, or the common law undergirding the Michigan Constitution. *Garcia,* therefore, does not stand for the proposition that the Michigan Constitution was intended to grant stronger protections than federal authority with regard to the standards to be applied to ineffective assistance of counsel. Under Michigan law ineffective assistance of counsel must be found to have been prejudicial in order to reverse an otherwise valid conviction.

2. There are no textual or structural differences with regard to the right to assistance of counsel between the federal and Michigan constitutional provisions. No peculiar state or local interests exist to warrant a different level of protection. Both provisions originated from the same concerns and to protect the same rights. Further, Michigan does not have a unique history with regard to the origin of the right to counsel. Statutory law before the adoption of the constitution did not mandate reversal of convictions because defense counsel may have deprived a defendant of an otherwise available and likely meritorious defense. Nor does constitutional or common-law history suggest that the design of the Michigan Constitution was to grant greater protection than *Strickland v Washington,* 466 US 668 (1984); rather, it compels the opposite conclusion.

3. The scope of a constitutional provision is not an issue of policy to be decided by a court of law, but is to be determined by proper constitutional authority. The Michigan Supreme Court is free to uphold greater protections provided by the Michigan Constitution if there is a principled basis in the history of Michigan jurisprudence to do so. However, reliance on Michigan precedent based on federal cases interpreting federal law does not provide such a principled basis. Similarly, reliance on foreign authority that has no bearing on Michigan jurisprudence does not provide a principled basis to discover the intention underlying the Michigan Constitution. Only Mich-

igan jurisprudence that interprets Michigan law may be utilized to find a principled basis to expansively interpret the Michigan Constitution, and no authority exists to justify a standard more protective than *Strickland.*

4. In these cases, neither defendant showed that he was denied the effective assistance of counsel. Additionally, in *Wallace,* the error of the trial court in denying independent neurological tests by the defense was harmless under the circumstances.

Justice BOYLE, concurring, stated that the right to effective assistance of counsel in the Michigan Constitution does not create a higher standard than that articulated in *Strickland.* However, while constitutional analysis should begin with an examination of the constitutional history surrounding the adoption of a constitutional provision, it does not necessarily end there.

Chief Justice CAVANAGH, concurring in part and dissenting in part, stated that because the ultimate focus of a claim of ineffective assistance of counsel must rest with the fundamental fairness of the trial, on the basis of the totality of the circumstances, and not only with the factual accuracy of the trial's result, the proper standard to evaluate such claims is reasonable probability that the attorney's incompetence caused deprivation of an otherwise available and likely meritorious defense.

Applying this standard in *Pickens* requires the conclusion that the defendant received effective assistance of counsel. Applied in *Wallace,* and for the reasons set forth by Justice LEVIN, the defendant was denied effective assistance of counsel and is entitled to a new trial. With respect to the refusal by the trial court for further neurological testing and its decision to admit disputed rebuttal testimony, neither alone warrants granting a new trial.

Justice MALLETT, concurring in part and dissenting in part, stated that to show prejudice under the Michigan Constitution, the defendant should be required to prove that there is a reasonable probability that the attorney's incompetence caused deprivation of an otherwise available and likely meritorious defense.

In *Pickens,* while the performance of the trial attorney was deficient, the defendant did not show that he was prejudiced by his counsel's errors. Thus, the judgment of the Court of Appeals should be reversed. In *Wallace,* in the light of all the circumstances it cannot be concluded that the attorney's performance was outside the range of professionally competent assistance.

Because the defendant did not show that his attorney's performance deprived him of an otherwise available and likely meritorious defense, his claim of ineffective assistance should fail, and the judgment of the Court of Appeals should be affirmed.

Justice LEVIN, concurring in *Pickens* and dissenting in *Wallace,* stated that judicial vindication of the right to the effective assistance of counsel reduces the risk that an innocent person was convicted, and provides some assurance that a conviction was obtained through fundamentally fair procedures. The standard for determining whether there was ineffective assistance should seek to secure procedural fairness and legal representation that enables an accused to meet the charges.

A reviewing court is obliged to examine the record to determine whether a convicted defendant claiming ineffective assistance of counsel was fairly represented by counsel. Such review will not indulge hindsight analysis of strategy or require perfect representation. Whatever test is applied, a reviewing court should examine the challenged representation in light of the purpose of the Sixth Amendment. The inquiry should focus on the fundamental fairness of the proceeding.

To justify reversal under the *Strickland* standard, a convicted defendant must show that the lawyer's performance was deficient, i.e., that counsel made errors so serious as not to be functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The convicted defendant must further show that the deficient performance prejudiced the defense, i.e., that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable.

The errors of Wallace's lawyer were objectively unreasonable and prejudicial. The prejudice arose from the failure to present a diminished capacity defense, coupled with cumulative errors by his lawyer concerning procedural and substantive law. Serious lawyer error pervaded the trial, undermining confidence that the verdict convicting Wallace of first-degree murder was based on the evidence rather than a breakdown of the adversarial process. The lead and concurring opinions ignore that factual guilt was not an issue. Wallace admitted shooting his wife. The sole issue was the degree of criminal responsibility and the level of culpability.

In *Pickens,* the defendant was not denied the effective assistance of counsel.

*Wallace* affirmed.

*Pickens* reversed.

CRIMINAL LAW — INEFFECTIVE ASSISTANCE OF COUNSEL — OBJECTIVE
    STANDARD — PREJUDICE — MERITORIOUS DEFENSE.
    To find that the right to effective assistance of counsel was so
    undermined as to justify reversal of an otherwise valid convic-
    tion, a defendant must show that counsel's performance fell
    below an objective standard of reasonableness and that the
    representation so prejudiced the defendant as to deprive the
    defendant of a fair trial.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training, and Appeals, and *Joseph A. Puleo* and *Thomas M. Chambers,* Assistant Prosecuting Attorneys, for the people.

*Joel D. Patterson* for defendant Pickens.

*Martin J. Beres* for defendant Wallace.

Amici Curiae:

*Joan Ellerbusch Morgan* for the Criminal Defense Attorneys of Michigan.

*Margaret Chiara, Donald E. Martin,* and *Guy L. Sweet* for the Prosecuting Attorney's Association of Michigan.

RILEY, J. At issue in these consolidated cases is whether the Michigan constitutional guarantee of the effective assistance of counsel provides a criminal defendant with greater protections than its federal counterpart. We hold that the intention underlying the Michigan Constitution does not afford greater protection than federal precedent with regard to a defendant's right to counsel when it involves a claim of ineffective assistance of counsel. Thus, to find that a defendant's right to

effective assistance of counsel was so undermined that it justifies reversal of an otherwise valid conviction, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial. Accordingly, we affirm the judgment of the Court of Appeals in *People v Wallace* and reverse the judgment of the Court of Appeals in *People v Pickens* because neither defendant is capable of showing that he was denied effective assistance of counsel.

Also at issue in *Wallace* is whether the denial of independent defense neurological tests by the trial court mandates reversal of defendant's conviction. While the trial court violated MCL 768.20a(3); MSA 28.1043(1)(3) by denying defendant's request for the tests, we affirm the conviction because the error was harmless under the circumstances.

Furthermore, we find that the admission of statements made by Wallace and others regarding the shooting and his past behavior as testified to by the prosecutor's rebuttal witness was not error because the statements were relevant to rebut Wallace's claim of insanity and were not unfairly prejudicial.

Hence, we affirm the judgment of the Court of Appeals in *Wallace* and reverse the judgment of the Court of Appeals in *Pickens.*

I

A

Defendant Dwayne Pickens was charged with selling less than fifty grams of cocaine to an undercover police officer in the City of Detroit. During his opening argument at trial, defense

counsel indicated that Eric Wright would testify that Pickens had been with him the day in question and had not delivered cocaine. The trial court, however, barred the introduction of the alibi witness because defense counsel had failed to file a notice of alibi as required by MCL 768.20(1); MSA 28.1043(1).[1]

Pickens was convicted as charged by the jury and sentenced to four to twenty years imprisonment. On appeal, he argued, inter alia, that he had been denied effective assistance of counsel because his counsel failed to file a notice of alibi and had not moved for an adjournment to correct the error. The Court of Appeals remanded for an evidentiary hearing pursuant to *People v Ginther,* 390 Mich 436, 442-444; 212 NW2d 922 (1973).

At the *Ginther* hearing, Pickens' trial counsel testified that her records did not show that she had failed to file a notice of an alibi defense. She indicated that she intended to call Wright to testify at trial as an alibi witness and that she had discussed that possibility with him and Pickens before trial. She could not recall if Wright appeared on the first day of trial, but remembered that he had been subpoenaed by her investigator and did not appear on the second day. She speculated that she did not move for an adjournment because the trial court's ruling precluding Wright was so definite. Following this pattern, Pickens' appellate counsel also waived production of Wright at the *Ginther* hearing. The record does not provide any explanation for his failure to testify at trial or the *Ginther* hearing.

After remand, the Court of Appeals found that Pickens was prejudiced by his trial attorney's

---

[1] MCL 768.20(1); MSA 28.1043(1) requires notice of an alibi defense be filed at least ten days before trial.

failure to timely file a notice of an alibi defense or to move for an adjournment.[2]

This Court granted leave to appeal, 443 Mich 884 (1993), and consolidated the case with *People v Wallace,* 443 Mich 883 (1993).

B

On August 4, 1986, defendant Ralph Wallace shot and killed his estranged wife as she sat across from him at a bar. After a preliminary examination, he was bound over for trial, and he personally retained defense counsel.

Counsel gave notice of Wallace's intent to raise an insanity defense, and the court granted the defense motion for an independent psychiatric evaluation. The court, however, later denied Wallace's request for additional neurological tests, including a CAT scan, that had been recommended by Dr. Rajendra K. Bhama, the independent psychiatric evaluator. In denying Wallace's motion for independent testing, the court reasoned that the trial should not be delayed to permit independent testing when identical tests had already been performed.[3] The court suggested that Dr. Bhama obtain the previous test results.

At trial, the prosecution argued that Wallace premeditated the murder of his wife. Various prosecution witnesses testified that Wallace threatened to kill her at least twice before the fatal shooting.[4] Witnesses to the slaying testified that Wallace,

[2] Unpublished opinion per curiam of the Court of Appeals, issued October 26, 1992 (Docket No. 115477).

[3] Although the record is unclear, it appears that only days earlier a CAT scan and other tests were performed. The record does not indicate who ordered these tests or their results.

[4] In fact, only a few days before the killing, Wallace told several people that his wife was having an affair and that they would all be better off if he killed her.

sitting across a table from his wife, shot her and, after pausing for almost a minute, fired again after she had fallen and appeared alive. He then stated that the victim was "only his wife" and placed the gun on the counter. After announcing to the crowd not to worry, he went to the restroom and his car, and returned to wait for the police. An officer testified that Wallace spoke coherently, appeared sober, and admitted shooting his wife.[5]

Defense counsel countered that Wallace was mentally ill at the time of the shooting and acted in the heat of passion. Wallace's employer testified that on the day of the murder, Wallace appeared at work explaining that his plans to go fishing had gone awry. After witnessing Wallace ranting and raving with a flushed face, he sent him home. His employer also admitted providing him tranquilizers and antidepressant drugs before the day of the shooting. Other defense witnesses testified that Wallace and his wife often argued, and that on the day of the slaying he was despondent about his children.

Wallace denied intending to murder his wife. He testified that he took a tranquilizer provided by his employer after arriving home from work. He then drank two beers at a tavern and two at home before his wife called. They met at a bar to continue a discussion about his wish to take their six-year-old daughter fishing. He did not recall taking the gun, but admitted that he probably did because it was night and he feared his wife's family, describing earlier altercations with her brother. He testified that at the bar his wife described sexual experiences with her new lover and demanded her wedding rings back. While he did not recall shooting his wife, he described seeing two

---

[5] Wallace told another officer that the victim had sex with her boyfriend in front of their young child.

enlarged moving images of her on the wall that appeared to be floating away. He felt as if he were going to explode.

Defendant's main witness for purposes of the insanity defense was his independent psychiatric examiner, Dr. Bhama, who concluded that he suffered from neurocortical damage and cerebellum dysfunction.[6] He theorized that on the day of the shooting, Wallace suffered from mental illness and disorder of thought and judgment. He also stated that Wallace lacked the substantial capacity of appreciating the wrongfulness of his conduct. He concluded that Wallace was legally insane at the time of the shooting.

The prosecution presented two expert rebuttal witnesses: Dr. Dexter Fields, chief psychiatrist at the Recorder's Court Psychiatric Clinic, and Ronald Kolito, senior clinical psychologist at the clinic. Dr. Fields disagreed with the diagnosis of organic brain syndrome, opining that Wallace was in touch with reality and that anxiety could have caused him to believe that his wife was larger than usual.

Kolito testified that Wallace was not psychotic or mentally ill at the time of the shooting. He buttressed his conclusion by testifying about comments made by Wallace about the day of the shooting, as well as observations of Wallace's co-worker about his behavior.[7] Defense counsel objected to much of his testimony as misleading and

---

[6] He diagnosed defendant as suffering from organic brain syndrome and from unconscious substitution or confabulation.

[7] For instance, Kolito testified:

> He said his wife once woke him up and accused him of child molesting. He also—then he related a story about seeing his estranged wife with a man in a motel. Said his wife had a two bedroom flat and saw them there with each other, and he saw them on three days, the defendant got there at ten o'clock and watched the front for four hours looking through the window.

impermissible hearsay. After giving the jury cura-
tive instructions, the trial court admitted the testi-
mony, reasoning that it provided the underlying
facts of an expert's opinion.[8]

The jury found Wallace guilty of first-degree
murder and of possession of a firearm during the
commission of a felony. After denying a motion for
new trial, the court sentenced him to the manda-
tory term of life plus two years for the felony-
firearm conviction.

Wallace appealed, and the Court of Appeals
granted a remand for a *Ginther* hearing on his
claim of ineffective assistance of trial counsel. The
Court denied the motion for a new trial and subse-
quent motions to remand. This Court granted
leave to appeal to consider: (1) whether Wallace
was denied the effective assistance of counsel, (2)
whether the trial court erred when it denied his
motion for neurological tests, and (3) whether the
trial court erred in admitting the disputed rebuttal
testimony.

II

At issue in these consolidated cases is the appli-
cation of the Michigan Constitution's guarantee of
the right to counsel to a claim of ineffective assis-
tance of counsel. Our Court of Appeals has inter-

---

He saw the man sitting at the table. At about two o'clock in
the morning he saw the man have sex with his estranged wife.
He heard him scream at his daughter. The defendant's daugh-
ter slept with him, the defendant, until she was four.

[8] Other prosecution witnesses testified that Wallace acted normally
during most of his activities before the shooting. Furthermore, it was
explained to the jury that the drug he had taken—Serax—is an
anxiety reducing drug that has a calming effect. Moreover, testimony
established that defendant drank alcohol and consumed Serax regu-
larly. The prosecution's expert noted that defendant probably pos-
sessed an acquired tolerance to these drugs—as opposed to an individ-
ual who mixed the drug with alcohol for the first time.

preted our decision in *People v Garcia,* 398 Mich 250; 247 NW2d 547 (1976), as requiring the reversal of a criminal conviction when defense counsel failed to perform as well as a reasonably competent attorney, even if the defendant was not prejudiced by such representation. See, e.g., *People v White,* 142 Mich App 581, 588-589; 370 NW2d 405 (1985). In *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), however, the United States Supreme Court found that to prove a claim of ineffective assistance of counsel mandating reversal of a conviction the Sixth Amendment requires not only that counsel's performance fell below an objective standard of reasonableness, but also that the representation so prejudiced the defendant as to deprive him of a fair trial.

At issue in the instant case is whether the Michigan Constitution requires the reversal of a criminal conviction when defense counsel's ineffective assistance did not so prejudice a defendant as to deprive him of a fair trial.

## A

### 1

Michigan law has long held that "[i]t is a maxim that the object of construction, as applied to a written Constitution, is to ultimately ascertain and give effect to the intent of the people in adopting it." *Kearney v Bd of State Auditors,* 189 Mich 666, 671; 155 NW 510 (1915). This is so because when interpreting the law *"it is the intent of the lawgiver that is to be enforced."* 1 Cooley, Constitutional Limitations (8th ed), p 125 (emphasis in original). Because "the constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people . . . in the sense

most obvious to the common understanding . . . ."
*Id.* at 143. Often, "to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered." *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley, Constitutional Limitations (6th ed), p 81.

Because a "constitutional limitation must be construed to effectuate, not to abolish, the protections sought by it to be afforded," failure to adhere to the purpose and history undergirding the document "is to make the constitutional safeguard no more than a shabby hoax, a barrier of words, easily destroyed by other words." *Lockwood v Comm'r of Revenue,* 357 Mich 517, 557, 556; 98 NW2d 753 (1959). In other words, without understanding both the origin and purpose of a constitutional provision, this Court cannot properly protect the mandate of the people because words stripped of their context may be manipulated and distorted into unintended meanings. See, e.g., *Carmen v Secretary of State,* 384 Mich 443, 452; 185 NW2d 1 (1971).[9]

2

As a guarantee of liberty, the phrase "assistance of counsel," by necessity, will not be defined in great detail in the constitution. Nevertheless, it is one of many terms that has "acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them.

---

[9] In short, "it is not the prerogative of this Court to change the plain meaning of words in the constitution 'as understood by the people who adopted it.'" *Regents of Univ of Michigan v Michigan,* 395 Mich 52, 74-75; 235 NW2d 1 (1975), quoting *Bond v Ann Arbor School Dist,* 383 Mich 693, 699; 178 NW2d 484 (1970).

We cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense." 1 Cooley (8th ed), *supra* at 132. Hence, we must examine the historical and common-law origins of the provision to properly understand its content.

Michigan has long recognized that "[p]erhaps the privilege most important to the person accused of crime, connected with his trial, is that to be defended by counsel." 1 Cooley (8th ed), *supra* at 696. See also Const 1963, art 1, § 20 ("[i]n every criminal prosecution, the accused shall have . . . assistance of counsel for his defense . . .").[10]

Moreover, Michigan law has well established that "it is a duty which counsel so designated owes to his profession, to the court engaged in the trial, and to the cause of humanity and justice, not to withhold his assistance nor spare his best exertions, in the defense of one who has the double misfortune to be stricken by poverty and accused of crime." 1 Cooley (8th ed), *supra* at 700. More specifically, a court is obliged to intervene when defense counsel "accept[s] the confidence of the accused, and then betray[s] it by a feeble and heartless defense." *Id.* at 704. In other words, Michigan law has long required that defense counsel present a reasonable defense. Because this test is no more protective than the federal standard,[11] we need not determine the exact contours of the Michigan guarantee.

[10] The Sixth Amendment to the United States Constitution also mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

[11] See *Strickland, supra* at 687-688 ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness").

3

The issue in the instant case, however, is: under what circumstances does the failure to perform that duty mandate reversal of a defendant's conviction? Under federal law, the purpose of the right to counsel "is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland, supra* at 691-692. To find prejudice, a court must conclude that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.[12]

Our Court of Appeals, however, has interpreted this Court's decision in *Garcia* as requiring the reversal of a conviction even if defense counsel's ineffective assistance did not prejudice the defendant. While we recognize that the opinion is less than a model of clarity and might be so interpreted, such a procedure is not mandated by federal law. *Garcia* essentially relied on Sixth and Fourteenth Amendment jurisprudence, and did not formulate the standard from the intentions, history, or common law undergirding the Michigan

---

[12] Furthermore,

an analysis focussing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. [*Lockhart v Fretwell,* 506 US —, —; 113 S Ct 838; 122 L Ed 2d 180, 189 (1993).]

Constitution.[13] *Garcia,* therefore, does not stand for the proposition that the Michigan Constitution was intended to grant stronger protections than federal authority with regard to the standards applied to the issue of ineffective assistance of counsel.

Indeed, Michigan constitutional law has long held that "[e]rrors which cannot possibly create any prejudice to the rights of one charged with crime ought not to, and cannot, operate as a ground for a new trial." *People v Wade,* 101 Mich 89, 91; 59 NW 438 (1894).[14] As Justice COOLEY

---

[13] *People v Dalessandro,* 165 Mich App 569, 575; 419 NW2d 609 (1988) ("the *Garcia* two-part test fairly appears to be interwoven with federal law, and the Court did not state that it was basing its decision on separate, adequate, and independent state grounds"); *People v Dalton,* 155 Mich App 591, 602; 400 NW2d 689 (1986) (HARRISON, J., concurring) ("A review of the proceedings of the state constitutional convention of 1961 shows no such indication as to the right to effective assistance of counsel"); *People v Hampton,* 176 Mich App 383, 387-388; 439 NW2d 365 (1989) (GRIFFIN, J., concurring) ("Although several panels of this Court have held that *Strickland* governs federal constitutional claims while *Garcia* applies to state claims, this dichotomy is not mandated by the language of the state constitution, Michigan constitutional history, or the holdings in *Garcia* . . . . *Garcia* does not rest upon separate or independent state constitutional grounds. Rather, it is based upon federal case law which has now been overturned").

The Court primarily relied upon *Beasley v United States,* 491 F2d 687 (CA 6, 1974), a Sixth Amendment case, for the proposition that a defendant did not have effective counsel if his counsel did not perform at least as well as an attorney with ordinary training and skill in the criminal law or he did not conscientiously protect his client's interests. The Court relied upon *People v Degraffenreid,* 19 Mich App 702, 718, n 22; 173 NW2d 317 (1969), which in turn was based upon the Due Process Clause of the Fourteenth Amendment for the proposition that ineffective assistance of counsel occurs when but for counsel's error a defendant would have had a reasonably likely chance of acquittal.

Yet, in *Degraffenreid, supra* at 716, the Court of Appeals also found that the Due Process Clause would be violated if "but for [attorney error,] the defendant might not have been convicted . . . ." None of these decisions, however, developed their holdings from sources independent of the federal law.

[14] See also *Strang v People,* 24 Mich 1, 9-10 (1871) (finding that the admission of inadmissible but unprejudicial testimony may not be the

explained, "[i]t is possible to be so nice in such matters as to render a legal conviction of crime practically impossible; and while the court should see to it on the one hand that no wrong shall be done the defendant, so on the other they are not to set aside a conviction obtained on a fair trial . . . ." *Strang v People,* 24 Mich 1, 10 (1871). In other words, "[w]e require a fair trial, not a perfect trial." *People v Beach,* 429 Mich 450, 491; 418 NW2d 861 (1988).

Hence, under Michigan law, counsel's ineffective assistance must be found to have been prejudicial in order to reverse an otherwise valid conviction. Thus, we reject defendants' contention that the Michigan Constitution mandates reversal of their convictions because of the ineffective assistance of counsel without a showing of prejudice, and overrule those Court of Appeals cases which so hold.

4

The next crucial issue, however, is the standard by which a defendant may prove that he was prejudiced by ineffective assistance of counsel. The United States Supreme Court has held that a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra* at 694. Nevertheless, at strong variance with Michigan and federal authority, Justice MALLETT would hold "that to show prejudice under the Michigan Constitution, the

basis of a reversal); *People v Hahn,* 214 Mich 419, 427; 183 NW 43 (1921) (finding a reversal unwarranted because the multiple alleged trial errors were harmless); *People v Horton,* 224 Mich 139, 142; 194 NW 486 (1923) (finding that evidence allegedly seized illegally did not warrant reversal).

defendant must prove that there is a reasonable probability that his attorney's incompetence deprived him of an otherwise available and likely meritorious defense." *Post* at 341. Noting that we have "decided issues relating to counsel without citing federal authority," and that the Court has at times interpreted the right to counsel to afford greater protections than the federal constitution, Justice MALLETT concludes that "there is historical authority to depart from *Strickland* and to establish our own standard regarding the applicable definition of prejudice." *Post* at 348.

The Michigan and federal constitutions, of course, may have different meaning. "As a matter of simple logic, because the texts were written at different times by different people, the protections afforded may be greater, lesser, or the same." *Sitz v Dep't of State Police,* 443 Mich 744, 761; 506 NW2d 209 (1993).[15] The question of state constitutional adjudication, however, is not whether this Court may interpret our constitution differently than the federal constitution, the issue is whether we must. Unless the constitutional authority exists to interpret the constitution differently, we must not. On the other hand, if constitutional authority directs an interpretation different than federal precedent, we must do so.

In accordance with our time-honored rules of

---

[15] Chief Justice COOLEY elaborated over a century ago:

And in seeking for its real meaning we must take into consideration the times and circumstances under which the State Constitution was formed—the general spirit of the times and the prevailing sentiments among the people. Every constitution has a history of its own which is likely to be more or less peculiar; and unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people agreeing to it. [*People v Harding,* 53 Mich 481, 485; 19 NW 155 (1884).]

constitutional construction, to justify an expansion of the Michigan Constitution beyond federal protections for identically worded phrases and provisions, such protections must be deeply rooted in the document. This Court may not engraft on to constitutional text "more 'enlightened' rights than the framers intended." *Id.* at 759. In fact, this Court has been reluctant to find greater protections of individual rights in identically phrased state constitutional provisions without a compelling reason.[16]

Thus, to determine whether the Michigan Constitution provides different or greater protection than the federal constitution, we may examine a variety, but limited, number of pertinent sources. As always, when interpreting a constitutional provision, we begin by examining its specific language. In fact, Michigan constitutional provisions often differ significantly than their federal counterparts.[17] Indeed, differences in language often reflect an intention to deviate from federal law and have an extensive history revealing that in-

[16] See, e.g., *People v Nash,* 418 Mich 196, 214; 341 NW2d 439 (1983) (opinion of BRICKLEY, J.). Unless a searching analysis of the understandings of the ratifiers and framers, as well as the historical circumstances surrounding the adoption of a provision, reveal otherwise, the Court must refrain from finding (or creating) such rights. See, e.g., *Harding, supra* at 485; *Nash, supra* at 214-215 (opinion of BRICKLEY, J.); *Sitz, supra* at 758-759.

[17] See, e.g., art 1, § 4 ("No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary"); art 1, § 5 ("Every person may freely . . . express . . . his views"); art 1, § 6 ("Every person has a right to keep and bear arms for the defense of himself and the state"); art 1, § 11 ("The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state"); art 1, § 16 ("cruel or unusual punishment shall not be inflicted"); art 4, § 24 ("No law shall embrace more than one object, which shall be expressed in its title"); art 5, § 19 ("The governor may disapprove any distinct item or items appropriating moneys in any appropriation bill").

tent—case law, statutory, or reflected in the convention debates.[18] In the instant case, there exists no textual difference with regard to the right to assistance of counsel between the federal and Michigan provisions. Each uses the same words in the same manner. While this is strong evidence that the provisions grant similar protections, we must also search elsewhere to determine if the contours of the Michigan guarantee are at variance with federal precedent.

Thus, we may examine the circumstances surrounding the adoption of the provision to aid in elucidating the intent underlying the provision. The circumstances surrounding this particular provision provide no evidence to support a finding that at the time of its ratification it was conceived that the constitution would be construed to adopt protections stronger than *Strickland.* The historical understanding of the provision before the 1963 Constitution did not include such a standard. Neither the Address to the People nor the Constitutional Convention debates suggest that a heightened standard was understood to be incorporated by the constitution. No evidence has been revealed offering insight into why ratifiers or framers may have envisioned such a standard to have been included in the constitution. Unlike other provisions, the right to assistance of counsel was not heavily debated, there were no alterations to its wording, and no controversies engendered regarding its meaning. No crisis of constitutional dimen-

---

[18] See, e.g., *People ex rel Drake v Mahaney,* 13 Mich 481, 495-496 (1865) (explaining the extensive history undergirding the Title-Object Clause [now art 4, § 24], which prohibits legislative practices common in the United States Congress); *Nash, supra* at 209-213 (explaining that art 1, § 11 was intended to permit the introduction of illegally seized narcotics and dangerous weapons in variation with federal law); 1 Official Record, Constitutional Convention 1961, p 478 (comments of Hodges) ("We did broaden [the Michigan parallel to the First Amendment] by adding the word 'express,' and I think that to the extent that radio and television can be given freedom, this is done").

sions existed involving the right. If the convention or ratifiers had intended to alter the meaning of this provision, we can presume "they would have done so by *express* words . . . ." *People ex rel Kennedy v Gies,* 25 Mich 83, 88 (1872) (emphasis in original). They did not.

The Court has outlined other pertinent factors that might signify that an alternative interpretation of the Michigan Constitution, when compared with the federal constitution, was intended:

- [S]tate constitutional and common-law history
- [S]tate law preexisting adoption of the relevant constitutional provision
- [S]tructural differences between the state and federal constitutions
- [M]atters of peculiar state or local interest. [*People v Collins,* 438 Mich 8, 31, n 39; 475 NW2d 684 (1991); *Sitz, supra* at 763, n 14.]

In the instant case, there exists no structural differences with regard to the right to assistance of counsel between federal and Michigan provisions. Moreover, no peculiar state or local interests exist in Michigan to warrant a different level of protection with regard to the right to counsel in the instant case. Both the federal and state provisions originated from the same concerns and to protect the same rights. Furthermore, Michigan does not have a unique history with regard to the origin of the right to counsel. Michigan statutory law before the adoption of the constitution did not mandate the reversal of convictions because defense counsel may have deprived a defendant of an otherwise available and likely meritorious defense.

Nor does constitutional or common-law history suggest that the design of the Michigan Constitution was to grant greater protections than *Strick-*

*land.* Strong deference is due contemporaneous and longstanding interpretations of the constitution because they most likely reflect its original understanding. *McPherson v Secretary of State,* 92 Mich 377, 383; 52 NW 469 (1892), aff'd 146 US 1; 13 S Ct 3; 36 L Ed 869 (1892). In other words, we should not disregard lightly the "jurisprudential history of this Court . . . ." *Sitz, supra* at 758. No Michigan case before the ratification of the 1963 Constitution had adopted Justice MALLETT's novel interpretation of the right to counsel. Indeed, our jurisprudential history, until *Garcia,* narrowly construed the right to counsel.[19] See, e.g., *In re Elliot,* 315 Mich 662; 24 NW2d 528 (1946), and authorities cited therein. Most precedent grappling with the issue of the standard of ineffective assistance of counsel did not articulate a standard and applied a very lenient one. See, e.g., *People v Boyce,* 314 Mich 608, 610; 23 NW2d 99 (1946); *People v Lundberg,* 364 Mich 596, 599-602; 111 NW2d 809 (1961).[20] In fact, recently after the adoption of the 1963 Constitution, the Michigan Court of Appeals adopted the permissive "farce and mockery of justice" standard that, at that time, had been adopted by the federal courts. See, e.g., *People v Davison,* 12 Mich App 429, 434; 163 NW2d 10 (1968). This reluctance to reverse convictions based on all but the most egregious errors of counsel is in complete accord with our long history of denying relief to convicted defendants in the absence of actual prejudice. See, e.g., *Strang, supra* at 9-10; *Wade, supra* at 91; *People v Hahn,* 214 Mich 419, 427; 183 NW 43 (1921); *People v Horton,* 224 Mich 139, 142; 194 NW 486 (1923). Michigan precedent,

---

[19] As noted, because of its federal foundation, *Garcia* is bereft of any value for Michigan constitutional analysis.

[20] In *People v Gorka,* 381 Mich 515, 521; 164 NW2d 30 (1969), the Court utilized an " 'adequate and effective' counsel" standard, but the Court apparently referred to the federal constitution.

therefore, not only fails to support the proposition that the Michigan Constitution requires a stronger standard of protection than *Strickland,* but compels the opposite conclusion.

The inapplicability of Michigan precedent in the instant case is clearly revealed by the citations of authority to justify an alternative standard. Alaska, Hawaii, and Massachusetts have not been known to adjudicate Michigan constitutional claims, nor is our fundamental document modeled after theirs. Michigan has a very distinct constitutional history, given content by its own constitutional conventions and ratifications in 1835, 1850, 1908, and 1963 and the adjudications arising from them. With all respect, the fact that courts in Hawaii and Alaska, which were admitted as states well over a century after the ratification of Michigan's first constitutional provision on the subject, have interpreted their independent constitutional provisions differently than the United States and Michigan Supreme Courts, proves little. Similarly, while Massachusetts has a long history of constitutional adjudication, it is separate and distinct from our own.

Moreover, those jurisdictions provide weak support for the alternative test. The Alaskan appellate courts, for instance, have recognized that, like *Garcia,* their test of ineffective assistance of counsel is based, at least in part, "upon an analysis of federal constitutional law and that it is possible that the Alaska Supreme Court may wish to reconsider the prejudice test . . . ." *Wilson v State,* 711 P2d 547, 549, n 1 (Alas App, 1985).

In *Commonwealth v White,* 409 Mass 266, 272; 565 NE2d 1185 (1991), quoting *Commonwealth v Saferian,* 366 Mass 89, 96; 315 NE2d 878 (1974), the Massachusetts Supreme Court, stated that prejudice will be found when "counsel's conduct

. . . 'has likely deprived the defendant of an otherwise available, substantial ground of defence.' " That court, however, consistently evaluated the effect of alleged attorney misconduct upon the outcome of the case as determined by the jury. *White, supra* at 275-277.[21] *White,* therefore, is scarce support for deviating from *Strickland.*[22]

The contention that a more protective standard than *Strickland* is justified does find some support in *State v Smith,* 68 Hawaii 304, 309; 712 P2d 496 (1986), in which the court ruled that it would adhere to its prior holding in *State v Antone,* 62 Hawaii 346, 348-349; 615 P2d 101 (1980), that ineffective assistance of counsel could be found if the errors of defense counsel " 'resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.' "[23] Unfortunately, the decision is devoid of any discussion of why such a standard fails to meet scrutiny under the Hawaii Constitution.

Not unlike *Smith,* Justice MALLETT reasons that deviation is justified because the *Strickland* standard for prejudice is "unduly burdensome" and that it "places too much emphasis on the reliability of the outcome, instead of considering the defendant's due process right to have a meaningful

[21] Specifically, the court found that defense counsel's decision not to interview and call witnesses to testify did not amount to ineffective assistance of counsel because such testimony would have highlighted the defendant's inconsistent position and the consistency of the victim's allegations to the jury. *Id.* at 275. The court also found that another allegation of error by counsel was irrelevant because "even assuming that counsel's failure to do so was manifestly unreasonable, the outcome of the case was in no way affected." *Id.* at 277.

[22] Also, neither is *Saferian* because that case was decided a decade before, and without the benefit of, *Strickland.*

[23] The court reasoned that *Strickland* was "unduly difficult for a defendant to meet," because a defendant would be successful " 'only where there is evidence that they should not have been convicted.' " *Id.* at 310, n 7, quoting Genego, *The future of effective assistance of counsel: Performance standards and competent representation,* 22 Am Crim L R 181, 199 (1984).

opportunity to affect that outcome." *Post* at 347, 349.

Yet, this Court is to avoid the "unprincipled creation of state constitutional rights that exceed their federal counterparts." *Sitz, supra* at 763.[24] Thus, the scope of the constitutional provision is not an issue of policy to be decided by a court of law, but is to be determined by proper constitutional authority.[25]

Adherence to time-honored principles of constitutional construction is essential to prevent the unwarranted creation of Michigan constitutional rights. By examining the constitutional text, the structure of our constitution, the circumstances surrounding its adoption, Michigan jurisprudence, and matters of peculiar or local interest, we ensure that constitutional guarantees maintain their vitality without permitting the creation of rights from whole cloth. While this is often a delicate matter, to hold otherwise grants the Court the license to create constitutional law without a principled basis and in derogation of the constitutional order in which the people, not this Court, create the fundamental law.[26] If the constitution is un-

[24] Indeed, Justice MALLETT agrees that we are "free to uphold greater protections pursuant to Const 1963, art 1, §§ 17 and 20, for the citizens of this state *if* we find a principled basis in the history of our jurisprudence to do so." *Post* at 347 (emphasis added).

[25] Justice CHRISTIANCY explained:

> The question is not whether the constitution ought to have permitted the exercise of this power; but whether, by a fair construction of the language of the instrument, as framed by the convention, and understood and adopted by the people, the power in question has been prohibited. Our province is not to make or modify the constitution, according to our views of justice or expediency, but to ascertain, as far as we are able, the true intent and purpose of the constitution which the people have deemed it just and expedient to adopt. [*People v Blodgett,* 13 Mich 127, 149-150 (1865).]

[26] As Justice POTTER explained:

wise, it is for the people to amend it.[27]

Reliance upon Michigan precedent based upon federal cases interpreting federal law, however, is not such authority. While leaving aside the propriety of those prior decisions, no Michigan precedent justifies the expansion of the guarantee in the instant case. Only Michigan jurisprudence that interprets Michigan law may be utilized to find a principled basis to expansively interpret the Michigan Constitution, and no such authority exists to justify a standard more protective than *Strickland.* Similarly, reliance upon foreign authority that has no bearing upon Michigan jurisprudence does not provide a principled basis to discover the intention underlying the Michigan Constitution. As Chief Justice CAVANAGH has observed in a similar context, "[w]here the historical case law" supporting a proposed formulation "constitutes an 'arid wasteland,' . . . that would seem to be a strong indication that [the formulation] cannot properly be recognized . . . ." *Li v Feldt (After Second Remand),* 439 Mich 457, 468; 487 NW2d 127 (1992). Indeed, "[t]he very aridity of the historical case law in this area actually makes it easier to apply" the constitution. *Id.* at 467.[28]

---

Changing by judicial construction the settled meaning of words aptly used in the Constitution is more than the exercise of legislative power. It wrests private rights from their moorings, lets down constitutional barriers, and alters the foundation of government. [*James S Holden Co v Connor,* 257 Mich 580, 600; 241 NW 915 (1932).]

[27] See Const 1963, art 12, § 1 (outlining the procedure by which the Legislature proposes, and the electorate may approve, a constitutional amendment); art 12, § 2 (outlining the procedure by which the people may both propose and approve a constitutional amendment); art 12, § 3 (outlining the procedure by which no later than every sixteen years the people may call a constitutional convention to revise the constitution).

[28] In *Li,* the Court determined that the historical precedent before the adoption of the governmental immunity act did not support a public nuisance exception to that act.

On the other hand, if the historical origins of the provision at issue reveal that the intention, design, or purpose of our constitutional provision was to mandate a different result, then we must follow that calling.[29] If, for instance, the common-law origins of the provision or the Address to the People evidenced stronger protection than that granted by the federal courts, we would be bound to grant it. In *Sitz,* for instance, the Court legitimately found that Michigan historical jurisprudence had interpreted a Michigan constitutional clause that, although identically phrased, embodied different principles of law than its federal counterpart. The precedent cited in *Sitz* involved Michigan case law interpreting the Michigan Constitution. Historical jurisprudence revealed that the Michigan provision intended to provide stronger protection than its federal counterpart with regard to the search and seizure of automobiles on the open highway without individualized suspicion. In the instant case, however, there is no such evidence.[30]

Furthermore, the adoption of the standard formulated by Justice MALLETT would severely undermine the judicial process envisioned by the constitution. Every criminal defense attorney must make strategic and tactical decisions that affect the defense undertaken at trial. Most criminal defense attorneys have a variety of options from which to choose that affect, if not determine, how

[29] [W]e may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection. [*Sitz, supra* at 759.]

[30] Because we find that the Michigan Constitution does not mandate stronger protection than *Strickland* and that Michigan courts are bound to adhere to the minimum guarantees found in *Strickland,* we do not determine the exact nature of the Michigan guarantee. We do note, however, that it may be different, even less, than *Strickland.*

the jury understands and comprehends the case. Many of these options in a particular case may be contradictory, confusing, incredible, or simply poor. The role of defense counsel is to choose the best defense for the defendant under the circumstances. *Strickland* permits the defense attorney to do so because, unless the attorney abandons a defense that had a reasonable probability of affecting the jury verdict, the attorney may choose the best defense. Defense counsel must be afforded "broad discretion" in the handling of cases, which often results in "taking the calculated risks which still do sometimes, at least, pluck legal victory out of legal defeat." *Lundberg, supra* at 600, 601. A standard more protective than *Strickland,* however, would ensure that many decisions by defense counsel would be subject to attack after a criminal conviction. Convictions would be overturned because convicted criminals could legally argue that defense counsel should have chosen other avenues of defense that, although tenable, did not have a reasonable probability of affecting the jury's verdict. In other words, a criminal defense attorney under such a formulation could be found to have provided ineffective assistance of counsel because he chose the better course.[31]

Furthermore, almost all criminal convictions

[31] Furthermore, as a constitutional ruling, prior convictions will come under such scrutiny, subjecting past criminal convictions to the new standard.

Similarly, plea bargains would have fallen within the ambit of the standard espoused by the dissent because a defense counsel's failure to formulate a defense, albeit one that would not have had a reasonable probability to affect the outcome of the case, may have led a defendant to accept a plea bargain. Defense counsel may become more reluctant to accept good plea bargains for fear that such decisions will now be subject to attack by a criminal defendant claiming to have had an "otherwise available and likely meritorious defense" even though defense counsel properly understood that it did not have a reasonable probability of affecting the jury's verdict. *Post* at 341.

Moreover, the inevitable result of such a formulation would be an explosion of civil litigation in which juries would be permitted to

would come under appellate and subsequent civil scrutiny, not only for fundamental deprivations of constitutional rights, but also because of the judicial imposition of an amorphous standard untested by our courts. Not only is such a result an unjustified departure in Michigan constitutional law, but it would engage Michigan courts in an endless quagmire of determining just what is meant by the standard. Instead of relying upon the well-established precedent developed under *Strickland,* our courts would be forced to struggle to craft appropriate rulings under a novel standard never evaluated by Michigan courts. As Judge Learned Hand warned, judgments would come under constant attack, and courts "would become Penelopes, forever engaged in unravelling the webs they wove." *Jorgensen v York Ice Machinery Corp,* 160 F2d 432, 435 (CA 2, 1947).

We are persuaded that, as Justice BRICKLEY has cautioned, we should not find that the Michigan Constitution grants greater protection than the federal constitution with regard to identically worded provisions unless there is a compelling reason founded in history and the intentions of the document to do so. *Nash, supra* at 214. Absent from Justice MALLETT's opinion is the searching analysis found in *Nash, Sitz,* or similar cases. No historical documentation suggests that the constitution was intended to provide any more protective meaning to the Michigan Constitution when compared to the federal constitution with regard to the right to the effective assistance of counsel. That this provision does not mandate such a proce-

award damages to a defendant who by definition has been reliably found guilty simply because defense counsel might have been more effective. That such a perversion of the truth-seeking function of criminal trials was not intended by the Michigan Constitution is beyond question.

dural morass is evident from the very uniqueness of the test in Michigan jurisprudence. Michigan courts, therefore, should not be forced to labor under an unprincipled and Court-imposed rule of law, contrary to the first principles of justice and the constitution.

B

Having determined the test to be applied in determining ineffective assistance of counsel claims, we now examine the facts presented in these consolidated cases.

1

In *Pickens,* defense counsel's failure to properly file notice of an alibi was inexcusable neglect. Her own testimony at the . *Ginther* hearing disclosed that she was aware of Wright's potential alibi testimony nearly three months before trial, yet she failed to file a timely notice or move for an adjournment to correct her error. Hence, her performance fell below the professional norm.

Nevertheless, Pickens has failed to establish the required showing of prejudice. Although the alibi witness was subpoenaed, he did not testify at the evidentiary hearing. Instead, for unexplained reasons, Pickens waived his production. Accordingly, no evidence has been presented to establish that the alibi witness would have testified favorably at trial. In other words, Pickens failed to establish that the alibi witness' testimony would have altered the result of the proceeding. Because Pickens cannot show that there was a reasonable probability that the evidence would undermine confidence in the outcome of the trial, the decision of the Court of Appeals is reversed.

2

Similarly, Wallace contends that his constitutional right to effective assistance of counsel was denied because his attorney failed to properly prepare and present an insanity defense, utterly failed to present a diminished capacity defense, and generally was incompetent.

a

The primary defense theory was that Wallace killed his wife because he was insane and provoked. While the record reveals that defense counsel may have more strongly presented the insanity defense, the record just as clearly reveals that the jury's decision to convict was based on the evidence—not counsel's performance.[32] As noted by the trial court when ruling on the ineffective assistance claim at the *Ginther* hearing:

> The case was a very difficult case, at best, because of two things. One, the facts of the case indicated that eye-witnesses observed Mr. Wallace not only shoot his wife in the bar, but lean over and shoot her as she lay on the floor under a table in the bar, and then walk over to the bar and put the gun down on the bar and say, "Oh, it's just my wife," as though "you all don't have anything to worry about, it's just my wife." In other words, "She's so insignificant I had a right to kill her and she needed killing, anyway."
>
> Now that's a very difficult fact for any attorney to have to deal with and present to 12 rational

[32] Several witnesses testified that defendant acted normally before the shooting, and defendant did not allege any mental illness except at the time of the actual shooting. Also, while defendant had injested a tranquilizer and drank beer the day of the shooting, each activity was not unusual for defendant. Furthermore, defendant brought a gun to the bar and shot his wife in a manner in which the jury could easily determine was premeditated.

people and expect them to say, "Oh, well, he's not guilty." That is a very difficult set of facts to deal with, number one.

[T]hen he had his client, who had a history of treatment with Dr. Bhama, and since Dr. Bhama was the person who had dealt with Mr. Wallace over a period of time, he was pretty much stuck with Dr. Bhama in terms of his expert as it related to Mr. Wallace's mental problems.

Furthermore, the *Ginther* hearing failed to reveal how a more seasoned attorney would have salvaged the insanity defense. Review of the *Ginther* hearing reveals that the jury was presented with a large array of expert testimony regarding the insanity defense. Wallace was unable to present additional evidence not presented to the jury that would have altered the outcome of the case. Thus, any ineffective assistance of counsel with regard to the presentation of the insanity defense does not justify reversal of the conviction.

b

Wallace also contends that counsel's choice not to pursue a diminished capacity defense constituted ineffective assistance of counsel. At the *Ginther* hearing, defense counsel explained that he purposefully rejected utilizing a diminished capacity defense because the first section of the diminished capacity instruction might have dissuaded the jurors from finding Wallace insane.[33] Furthermore, counsel explained that because evidence was

---

[33] The jury instruction on diminished capacity provides:

(1) A person who is under the influence of voluntarily consumed [alcohol/(and/or) controlled substances] at the time of the alleged offense is not for that reason alone to be judged legally insane.
(2) However, a person may be mentally ill and intoxicated, with both conditions affecting his actions. It is for you to judge

presented refuting that his client was intoxicated at the time of the shooting, a diminished capacity defense instruction would have been detrimental to his client's defense.

As a Court far removed from the passion, dust, and grit of the courtroom, we must be especially careful not to second-guess or condemn with hindsight the decisions of defense counsel. A defense attorney must enjoy great discretion in the trying of a case—especially with regard to trial strategy and tactics. See, e.g., *Lundberg, supra* at 600. After all, the attorney witnessed or conducted voir dire, understood the credibility and demeanor of witnesses and his client, grappled with the evidence and testimony, and sensed the prosecutor's strategy. We only have the cold record.

In the instant case, defense counsel's strategic choice to focus on the insanity defense while downplaying the impaired capacity defense should not be presumed error simply because it was unsuccessful. The evidence of Wallace's guilt was truly overwhelming—Wallace shot his wife point blank at least twice before a room of witnesses and shrugged her death off as if he had squashed a bug. The difficulties of the case made any trial extraordinarily difficult for defense counsel, and counsel carefully determined the best defense available. We cannot conclude, therefore, that in light of all the circumstances his performance was "outside the wide range of professionally competent assistance." *Strickland,* 466 US 690.

Nor does Wallace show that he was prejudiced

whether, under all of the circumstances, the defendant was mentally ill at the time of the offense, and then to apply the further tests of whether or not the defendant was legally insane. [CJI 7:8:02.]

by counsel's failure to pursue the diminished capacity defense. The lack of specific instructions regarding this defense did not preclude development of the theory that Wallace's long-term alcohol and substance abuse contributed to the alleged temporary insanity he experienced at the time that he shot his wife. Hence, because this theory was adequately presented by counsel, and rejected by the jury, a further instruction on diminished capacity would not have aided the defendant. This is also true because a necessary component of the diminished capacity defense is that the defendant was mentally ill. The jury rejected such a finding when it rejected the guilty but mentally ill verdict. Hence, Wallace was not prejudiced by counsel's choice not to pursue the diminished capacity defense.

c

Finally, Wallace assails counsel's general competence. At times, counsel demonstrated a lack of familiarity with basic rules of procedure and basic rules of law. He consulted written notes and reference material to answer questions put to him by appellate counsel on rules of evidence and procedure, and insisted to the jury and the court that second-degree murder was a specific intent crime. He also asked the trial court who was to bring the directed verdict motion, and the order of closing arguments. He, however, explained at the *Ginther* hearing that many of these actions were attempts to gain favor from the court. Furthermore, none of these claimed errors prejudiced Wallace. After all, the trial court properly instructed the jury, a motion for directed verdict would have certainly

failed, and closing arguments proceeded in the correct order.[34]

While counsel's performance was disturbing at times, the trial court's conclusion when denying the motion for new trial on the ground of ineffective assistance of counsel is unassailable:

> Under the circumstances, I have to agree that at times [defense counsel] did appear to be confused in terms of the way in which the case was being presented. In looking at the total facts of the case, though, the only conclusion that I could come to at the time was that the confusion was being caused by the factual situation, the complexity of the defense that he was trying to present, and the other problems that were attendant to representing Mr. Wallace . . . .
>
> *          *          *
>
> And under the circumstances, I cannot say that Mr. Wallace's retained counsel represented him ineffectively. I think there were probably things that in hindsight we could all say we should have done or could have done, but I cannot say that there was any serious mistakes that he made that resulted in Mr. Wallace being denied a fair trial or effective assistance of counsel.

Wallace's bare allegation that he was denied effective assistance of counsel is insufficient to make it so—none of the behavior complained of appears to have affected the outcome of the trial.

---

[34] Wallace also alleges that defense counsel was untruthful, either at the *Ginther* hearing or during trial, regarding when he obtained and reviewed a crucial prosecution expert's report. At trial he stated that he did not know Kolito's report would be used and had not studied or discussed it with Wallace until the night before trial. However, when confronted with these assertions at the evidentiary hearing, he explained that he received the report and immediately studied it with Wallace eleven days before the trial. He explained that his prior assertions were merely an attempt to "try and lean on the Court" for additional time. In any event, Wallace does not explain how this conduct prejudiced his defense.

Thus, Wallace has failed to show that he was prejudiced by his counsel's behavior, and that he was denied effective assistance of counsel.

III

A

Wallace also contends that the trial court erred by denying him the opportunity to obtain certain neurological tests as deemed necessary by an independent psychiatric evaluator.

MCL 768.20a(3); MSA ·28.1043(1)(3) provides:

> The defendant may, at his or her own expense, or if indigent, at the expense of the county, secure an independent psychiatric evaluation by a clinician of his or her choice on the issue of his or her insanity at the time the alleged offense was committed. The defendant shall notify the prosecuting attorney at least 5 days before the day scheduled for the independent evaluation that he or she intends to secure such an evaluation. The prosecuting attorney may similarly obtain independent psychiatric evaluation. A clinician secured by an indigent defendant shall be entitled to receive a reasonable fee as approved by the court.[35]

The trial court denied Wallace this right when it denied him independent neurological testing deemed necessary by his privately financed psychiatrist. The request required that Wallace be transported while in custody and a thirty-day delay of the trial. This Court recognizes that the trial court, in an attempt to promote judicial economy and efficiency, sought to deny Wallace's request for independent testing in light of the delay and ear-

[35] The United States Supreme Court in *Ake v Oklahoma,* 470 US 68, 83; 105 S Ct 1087; 84 L Ed 2d 53 (1985), specifically left the decision how to implement the right of a defendant gaining access to a competent psychiatrist to the states.

lier neurological tests that had been performed on the defendant less than a week before. Yet, a general interest in promoting judicial economy and efficiency may not deny the clear mandate of MCL 768.20a(3); MSA 28.1043(1)(3).

While the trial court violated MCL 768.20a(3); MSA 28.1043(1)(3), Wallace's conviction may not be set aside unless the error resulted in a miscarriage of justice. MCL 769.26; MSA 28.1096. Neurological tests had already been administered the day defense counsel filed his motion for independent psychiatric tests.[36] While defense counsel was granted the opportunity to obtain an independent evaluation of these earlier tests and to question the doctor who performed the tests, he did not pursue these options to garner further information. Furthermore, the defense expert testified that defendant was suffering from mental illness in light of the pertinent information he possessed. Thus, Wallace's defense was not prejudiced by the absence of independent tests.

The trial court's error, therefore, did not constitute a miscarriage of justice requiring reversal of Wallace's conviction.

IV

Finally, Wallace contends that his conviction should be reversed because of the admission of statements made by him and others as testified to by a prosecution expert rebuttal witness while explaining how he diagnosed Wallace's mental state.

Generally, evidence underlying the basis of an

---

[36] The neurological tests included a CAT scan. The trial judge specifically denied Wallace's request for another CAT scan.

expert opinion is admissible. MRE 703, 705.[37] Fur-
thermore, MCL 768.20a(5); MSA 28.1043(1)(5) al-
lows the introduction of statements made by a
defendant to personnel of the Center for Forensic
Psychiatry regarding the defendant's mental ill-
ness or insanity at the time of the alleged offense.
Such evidence is relevant because it places the
expert's opinions into a factual context, thereby
enabling the trier of fact to determine the weight
due an expert's opinion.

In the instant case, the prosecution's rebuttal
witness' testimony was relevant for the limited
purpose of evaluating the credibility of his conclu-
sion that Wallace was not mentally ill or legally
insane at the time of the shooting. See *People v
James Robinson,* 417 Mich 661, 664; 340 NW2d
631 (1983).

Wallace correctly notes, however, that relevancy
is not the sole determinant of admissibility.[38] MRE

---

[37] MRE 703 provides:

The facts or data in the particular case upon which an expert
bases an opinion or inference may be those perceived by or
made known to him at or before the hearing. The court may
require that underlying facts or data essential to an opinion or
inference be in evidence.

MRE 705 provides:

The expert may testify in terms of opinion or inference and
give his reasons therefor without prior disclosure of the under-
lying facts or data, unless the court requires otherwise. The
expert may in any event be required to disclose the underlying
facts or data on cross-examination.

[38] The prosecution's reliance on *People v Dobben,* 440 Mich 679,
693-694; 488 NW2d 726 (1992), for the contention that the only
limitation on an expert's testimony is that set forth in MCL
768.20a(5); MSA 28.1043(1)(5) is incorrect. In *Dobben,* the Court
stated: "Section 20a makes no reference to any limitation in the
testimony of such an expert, other than that '[s]tatements made by
the defendant . . . shall not be admissible . . . on any issues other
than . . . mental illness or insanity at the time of the alleged

403 requires the exclusion of relevant evidence "if
its probative value is substantially outweighed by
the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations
of undue delay, waste of time, or needless presen-
tation of cumulative evidence."

The disputed testimony concerns innuendo of
sexual perversion, a statement that Wallace talked
to his attorney and "formulated plans," and a
recitation of what a police officer told him regard-
ing his statements and actions on the night of the
killing. Kolito also related Wallace's statements
that he had observed his estranged wife having sex
with another man, that his wife alleged that he
molested their daughter, and that he slept with
their daughter until she was four years old. A
curative instruction was read by the trial court
after Kolito's testimony.

Applying MRE 403, we do not find that the trial
court abused its discretion in admitting Kolito's
testimony. There is no doubt that Kolito's testi-
mony was prejudicial to Wallace. The inquiry
pursuant to MRE 403, however, is whether the
disputed evidence was unfairly prejudicial. After
all, presumably all the evidence presented by the
prosecutor was prejudicial because it attempted to
prove that defendant committed the crime
charged. Our Court of Appeals has explained:

> Obviously, evidence is offered by an advocate for
> the always clear, if seldom stated, purpose of
> "prejudicing" the adverse party. Recognizing this,
> the Supreme Court in adopting MRE 403 identified
> only unfair prejudice as a factor to be weighed

offense.' " However, this statement was made to address an entirely
different issue than that presented here—whether an independent
expert may rely on historical evidence in testifying regarding the
issue of criminal responsibility, or whether only a government-
employed, certified clinician may rely on historical evidence.

against probative value. This unfair prejudice re-
fers to the tendency of the proposed evidence to
adversely affect the objecting party's position by
injecting considerations extraneous to the merits
of the lawsuit, e.g., the jury's bias, sympathy,
anger, or shock. [*People v Goree,* 132 Mich App
693, 702-703; 349 NW2d 220 (1984).]

In determining that Kolito's testimony was not
unfairly prejudicial, we note that the relevancy of
the testimony was bolstered by the defense coun-
sel's repeated attacks on Kolito's credibility. The
defense "opened the door" to this testimony by
calling into question Kolito's conclusion that Wal-
lace was not mentally ill.[39] Furthermore, the back-
ground testimony helped explain Wallace's state of
mind leading up to the shooting. While the testi-
mony was damaging to Wallace's defense, it was so
because it bolstered Kolito's conclusion that he
was not mentally ill when he shot his wife.

[39] The following exchange between the prosecutor, Mr. Kolito, and
defense counsel is illustrative:

*Q.* So then based on all the information that you had did you
come to an opinion as to whether or not the defendant was
mentally ill on August the 4th of 1986?
*A.* Yes sir.
*Q.* What is that opinion?
*A.* That he was not mentally ill.
*Q.* Why not?
*A.* Well, the defendant had functioned at his place of employ-
ment that day. The defendant was an electrical inspector.
There is no evidence that the defendant was experiencing any
systems [sic] of psychosis, any symptoms of delusions . . .
[*Defense Counsel*]: Objection, he doesn't know, he wasn't
there, he doesn't know what he was experiencing, whether he
was experiencing blackouts or anything and he's testifying to
this jury that on August the 4th Shorty Wallace was just fine.
Where was he on August the 4th? He wasn't around Shorty
Wallace.

It was after this exchange that Kolito read his report, which
referenced statements made by others who witnessed Wallace's con-
duct on the day of the shooting.

Because the testimony was relevant and not unfairly prejudicial, the curative instruction given by the trial court sufficiently removed any potential unfair bias generated from the testimony. Thus, we affirm the admission of the evidence.

v

At issue in these consolidated cases is whether the Michigan constitutional guarantee of the effective assistance of counsel provides a criminal defendant with greater protections than its federal counterpart. We hold that the intention underlying the Michigan Constitution does not afford greater protection than federal precedent with regard to a defendant's right to counsel when it involves a claim of ineffective assistance of counsel. Thus, to find that a defendant's right to effective assistance of counsel was so undermined that it justifies reversal of an otherwise valid conviction, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial. Accordingly, we affirm the judgment of the Court of Appeals in *People v Wallace* and reverse the judgment of the Court of Appeals in *People v Pickens* because neither defendant is capable of showing that he was denied effective assistance of counsel.

Also at issue in *Wallace* is whether the denial of independent defense neurological tests by the trial court mandates reversal of defendant's conviction. While the trial court violated MCL 768.20a(3); MSA 28.1043(1)(3) by denying defendant's request for the tests, we affirm the conviction because the error was harmless under the circumstances.

Furthermore, we find that the admission of

statements made by Wallace and others regarding the shooting and his past behavior as testified to by the prosecutor's rebuttal witness was not error because the statements were relevant to rebut Wallace's claim of insanity and were not unfairly prejudicial.

Hence, we affirm the judgment of the Court of Appeals in *Wallace* and reverse the judgment of the Court of Appeals in *Pickens.*

BRICKLEY, BOYLE, and GRIFFIN, JJ., concurred with RILEY, J.

BOYLE, J. (*concurring*). I have signed Justice RILEY's opinion because I fully agree with her result and with the conclusion that the right to effective assistance of counsel in the Michigan Constitution does not create a higher standard than *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). I write separately simply to observe that, while I feel constitutional analysis should begin with an examination of history, I do not agree that it necessarily ends there. For example, I do not agree with the statement that

> [u]nless a searching analysis of the understandings of the ratifiers and framers, as well as the historical circumstances surrounding the adoption of a provision, reveal otherwise, the Court must refrain from finding (or creating) such rights. [*Ante* at 316, n 16.]

The analytical difficulty, of course, is that the text and surrounding circumstances so rarely reveal otherwise. Nevertheless, when required to answer the question, we must acknowledge other principled lines of inquiry, while acknowledging the primacy of the language of the document.

Cavanagh, C.J. (*concurring in part and dissenting in part*). The purpose of the effective assistance of counsel requirement is to ensure fair trials. Because I believe that the ultimate focus must rest with the fundamental fairness of a trial, on the basis of the totality of the circumstances, and not just with the factual accuracy of a trial's result, I endorse Justice Mallett's standard as the proper test to be used to evaluate ineffective assistance of counsel claims. Accordingly, I concur with part i of Justice Mallett's concurring opinion.

Applying Justice Mallett's standard to *Pickens,* I concur with the Court that defendant Pickens was provided effective assistance of counsel.

Applying Justice Mallett's standard to *Wallace,* I agree with Justice Levin that, for all the reasons set forth in parts ii and iii of his dissent, defendant Wallace was indeed denied effective assistance of counsel, and is therefore entitled to a new trial. Accordingly, I concur with parts ii and iii of Justice Levin's dissenting opinion.

Concerning the other two substantive issues raised in *Wallace,* I adopt Justice Riley's conclusion that neither the trial judge's decision to refuse further neurological testing, nor his decision to admit the disputed rebuttal testimony, taken alone, warrants granting defendant Wallace a new trial. Accordingly, I concur with parts iii and iv of Justice Riley's majority opinion.

Mallett, J. (*concurring in part and dissenting in part*). The primary issue in these consolidated criminal cases is what standard should apply in determining if a criminal defendant's conviction should be set aside on grounds of ineffective assistance of counsel. More precisely, we granted leave to consider if we should adopt the two-pronged test for ineffective assistance of counsel as set forth by

the United States Supreme Court in *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Today, we adopt the *Strickland* test that requires a criminal defendant to show: (1) that counsel's performance was deficient, falling below an objective standard of reasonableness, and (2) that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. I write separately because I would hold that to show prejudice under the Michigan Constitution, the defendant must prove that there is a reasonable probability that his attorney's incompetence deprived him of an otherwise available and likely meritorious defense.

Applying this test, I would reverse the decision of the Court of Appeals, affirming the conviction in *People v Pickens,* and affirm the Court of Appeals affirmance of the conviction in *People v Wallace.*

I

A

These consolidated cases place squarely before this Court the question what standard for determining ineffective assistance of counsel is to be applied in this state.

Before the United States Supreme Court's decision in *Strickland,* Michigan Court of Appeals panels followed a bifurcated test for ineffective assistance that was alluded to in *People v Garcia,* 398 Mich 250; 247 NW2d 547 (1976).[1] This bifur-

---

[1] Although this test is referred to as the "*Garcia* test," this Court's opinion in that case did not fully explain or give a rationale for what the exact test for ineffectiveness pursuant to Const 1963, art 1, § 20, should be. Instead, the Court merely explained that the defendant's contention that he was denied a fair trial under either *People v Degraffenreid,* 19 Mich App 702; 173 NW2d 317 (1969), or *Beasley v United States,* 491 F2d 687, 696 (CA 6, 1974), was unfounded. *Garcia* at 264-266.

cated test allowed defendant a new trial on grounds of ineffective assistance of counsel if he could show: (1) that his trial counsel did not perform at least as well as a lawyer with ordinary training and skill in the criminal law, conscientiously protecting his client's interests undeflected by conflicting considerations, *or* (2) that his trial counsel made a serious mistake, without which the defendant would have had a reasonably likely chance for acquittal. *Id.* at 264-266.

Pursuant to the *Garcia* test, as long as a criminal defendant could show that his attorney's performance fell below the professional norm, he need not show that he was prejudiced by his counsel's ineffectiveness. Only when his counsel performed with otherwise ordinary skill, but made a serious mistake, did the defendant need to show that he was prejudiced by this mistake.

In *Strickland,* the United States Supreme Court held that to successfully claim ineffective assistance of counsel under the Sixth Amendment the defendant must show *both* that counsel's performance was deficient and that the deficient performance prejudiced the defense so that the trial could not be relied on as having produced a just result. This standard differs from that developed following *Garcia,* because pursuant to *Strickland* a defendant must always prove actual prejudice.

After *Strickland,* Court of Appeals panels have taken differing views on whether a showing of prejudice is required in order for a state conviction to be overturned and a new trial granted on grounds of ineffective assistance of counsel.[2] Today, I join with the majority and follow *Strickland* in

---

[2] Although, pursuant to Administrative Order No. 1990-6, all Michigan Court of Appeals panels and trial courts were bound by the *Strickland* test as adopted in the "first out" case, *People v Tommolino,* 187 Mich App 14; 466 NW2d 315 (1991), this Court had yet to definitively state that *Strickland* is the governing standard.

adopting a two-pronged test as the standard to be applied pursuant to the Michigan Constitution's right to counsel provision, Const 1963, art 1, § 20, and due process guarantee, Const 1963, art 1, § 17.

1

To successfully claim ineffective assistance of counsel, a defendant must show that his attorney performed below an objective standard of reasonableness under prevailing professional norms. This is the first prong of the *Strickland* test. The Court elaborated that the defendant must overcome a "strong presumption" that his counsel's conduct constituted reasonable trial strategy. *Strickland* at 689. It also provided the following guidance for determining when counsel's performance falls below the level required to ensure a reliable result at trial:

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. [*Id.* at 690.]

The approach taken in *Strickland* for determination of the reasonableness of counsel's conduct is consistent with Michigan precedent. In adopting the first prong of the *Strickland* test, the standard for incompetence set forth by this Court in *Garcia,* wherein we determined that defense counsel must perform at least as well as a lawyer with ordinary

training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations is reaffirmed. *Garcia* at 264. Action appearing erroneous from hindsight does not constitute ineffective assistance if the action was taken for reasons that would have appeared at the time to be sound trial strategy to a competent criminal attorney. *Id.* at 266.

2

Pursuant to *Strickland,* a showing of incompetency is not enough to successfully challenge a conviction on ineffective assistance of counsel grounds. *Strickland* further requires a defendant to show that his counsel's errors prejudiced the defense so as to deprive the defendant of a fair trial.

The prejudice requirement has constitutional origins, deriving from the fair trial guarantee of the Due Process Clauses of the Fifth and Fourteenth Amendments. As noted in *Strickland:*

> In a long line of cases that includes *Powell v Alabama,* 287 US 45 [53 S Ct 55; 77 L Ed 158] (1932), *Johnson v Zerbst,* 304 US 458 [58 S Ct 1019; 82 L Ed 1461] (1938), and *Gideon v Wainwright,* 372 US 335 [83 S Ct 792; 9 L Ed 2d 799] (1963), this Court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial. The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause . . . .
>
> *   *   *
>
> The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the

outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. [*Id.* at 684-685, 691-692.]

I read *Strickland* as basing the right to effective assistance on both the Sixth Amendment Right to Counsel Clause and on the Due Process Clauses. I view the right to effective assistance of counsel as involving two components. The first is procedural, the second substantive. The procedural component derives from the right to counsel provision and guarantees the right to a competent attorney. The substantive component has due process origins and provides a right to representation that leads to a fair trial.[3]

A prejudice requirement is also consistent with the harmless error doctrine. Michigan recognizes this doctrine in various contexts. The Legislature has suggested its approval of the doctrine in MCL 769.26; MSA 28.1096, which requires that even upon a demonstration of an error by counsel, there also must be a showing of actual prejudice. Similarly, MCR 2.613(A) recognizes harmless error, defining the rule as follows:

An error in the admission or the exclusion of evidence, an error in a ruling or order, or *an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial,* for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, *unless refusal to take this action appears to the court inconsistent with substantial justice.* [Emphasis added.]

In addition, this Court has voiced agreement

---

[3] See Gilles, *Effective assistance of counsel: The Sixth Amendment and the fair trial guarantee,* 50 U Chi L R 1380 (1983).

with *Chapman v California,* 386 US 18; 87 S Ct
824; 17 L Ed 2d 705 (1967), holding that constitu-
tional errors committed during trial will not merit
automatic reversal. Instead, reversal is warranted
only where: (1) the error is so offensive to the
maintenance of a sound judicial system that it
never can be regarded as harmless, or (2) if not so
basic, the error is not harmless beyond a reason-
able doubt. *People v Michael M Robinson,* 386
Mich 551, 563; 194 NW2d 709 (1972).

In *People v Mosko,* 441 Mich 496, 502-503; 495
NW2d 534 (1992), this Court stated:

> Rules of automatic reversal are disfavored, for a
> host of obvious reasons. The doctrine of harmless
> error has been adopted by the Legislature and by
> this Court, and has been applied by this Court in
> many different contexts. As this Court said in
> [*People v*] *Beach* [429 Mich 450, 491; 418 NW2d
> 861 (1988)], "We require a fair trial, not a perfect
> trial."

Given the value this Court and our Legislature
have given to the doctrine of harmless error, it
would be inconsistent and make little sense to
allow reversal of a conviction on ineffective assis-
tance of counsel grounds without some showing of
prejudice.

Furthermore, this Court has cited with approval
*Coleman v Alabama,* 399 US 1, 9; 90 S Ct 1999; 26
L Ed 2d 387 (1970), wherein the United States
Supreme Court applied a harmless error analysis
to the denial of the right to counsel at a prelimi-
nary examination. *People v Hall,* 435 Mich 599,
605-606; 460 NW2d 520 (1990). In so doing, this
Court has indicated a departure from the Michi-
gan Court of Appeals decisions that rely on *Beas-
ley v United States,* 491 F2d 687 (CA 6, 1974), in
holding that the harmless error doctrine (or a

prejudice inquiry) does not apply where the attorney's errors fail the "ordinary skill" test. To the extent that *Garcia* has been interpreted as not requiring a showing of prejudice when an attorney fails to perform at the level of ordinary skill possessed by a competent criminal attorney, it should be overruled.

**B**

While I find that a prejudice requirement has constitutional underpinnings, comports with the harmless error doctrine, and various policy reasons support such a requirement, I would not adopt *Strickland*'s definition of prejudice in its entirety because that standard is unduly burdensome.

In interpreting the Michigan Constitution, this Court is compelled neither to accept nor reject federal interpretations of parallel provisions of the United States Constitution. Instead, "[i]n each instance, what is required of this Court is a searching examination to discover what law 'the people have made.'" *Sitz v Dep't of State Police,* 443 Mich 744, 759; 506 NW2d 209 (1993), citing *People v Harding,* 53 Mich 481, 485; 19 NW 155 (1884).

While the text of the state and federal due process and right to counsel provisions are virtually identical, this Court is free to uphold greater protections pursuant to Const 1963, art 1, §§ 17 and 20, for the citizens of this state if we find a principled basis in the history of our jurisprudence to do so. *Sitz, supra* at 763.

Although the prosecution, citing *People v Bellanca,* 386 Mich 708; 194 NW2d 863 (1972), asserts that Michigan has interpreted the state constitutional right to counsel consonant with that set forth in the federal constitution, the *Bellanca*

decision addressed only the right to discovery and counsel at a preliminary examination. It does not stand for the general proposition that the state right to counsel is entirely coextensive with its federal counterpart.

In other cases, this Court has decided issues relating to counsel without citing federal authority. See *People v Cavanaugh,* 246 Mich 680; 225 NW 501 (1929), and *People v Lundberg,* 364 Mich 596, 599-602; 111 NW2d 809 (1961). Furthermore, although not commanding a full majority, in *People v Wright,* 441 Mich 140; 490 NW2d 351 (1992), three justices determined that Michigan's Constitution afforded greater protection than did the United States Supreme Court's interpretation of the federal constitution, where a suspect is denied knowledge of the presence of retained counsel and then waives his right to counsel.[4]

Also, in *People v Jackson,* 391 Mich 323, 338-339; 217 NW2d 22 (1974), this Court acknowledged that it was announcing a rule applicable to the right to counsel at photographic show-ups that was more expansive than the United States Supreme Court had set forth on the same issue.

Thus, there is historical authority to depart from *Strickland* and to establish our own standard regarding the applicable definition of prejudice.

The prejudice requirement set forth in *Strickland* requires a defendant to show that there is a reasonable probability that, but for counsel's er-

---

[4] Justices Levin and Mallett held that the right against self-incrimination, the right to remain silent, and the right to counsel afforded by Const 1963, art 1, § 17, include being informed by the police of attempted contact in person by retained counsel. Chief Justice Cavanagh concurred, but would have further required the police to take prompt and diligent steps to inform the suspect of his attorney's attempts to contact him or would render subsequent statements by the suspect inadmissible as taken in derogation of the right to counsel. Justice Brickley concurred in the result, but found lack of a valid waiver on other grounds.

rors, the result of the proceeding would have been different. In the context of a criminal trial, the *Strickland* definition of prejudice requires the defendant to show that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 US 695.

This definition of prejudice places too much emphasis on the reliability of the outcome, instead of considering the defendant's due process right to have a meaningful opportunity to affect that outcome.[5]

Other jurisdictions have also rejected the *Strickland* standard for determining prejudice. For example, the Massachusetts Supreme Court, while citing *Strickland,* defines the inquiry under the prejudice prong as whether counsel's deficiencies caused "prejudice to the defendant's case." *Commonwealth v White,* 409 Mass 266, 275; 565 NE2d 1185 (1991). That court's analysis continues to rely on the standard it developed before *Strickland,* allowing reversal if the attorney's unprofessional errors "deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth v Saferian,* 366 Mass 89, 96; 315 NE2d 878 (1974).

Hawaii has also rejected *Strickland*'s prejudice test, noting that it has been criticized as unduly difficult for defendants. Hawaii instead requires a defendant to show that counsel's errors or omissions " 'resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.' " *State v Smith,* 68 Hawaii 304, 309; 712

[5] A standard that focuses only on the reliability of the outcome ignores the procedural element of the right to effective assistance, turning the right to effective assistance into a singular issue of harmless error. The right to effective assistance includes a right to have an attorney who is at least minimally competent to assist in presenting the defense.

P2d 496 (1986); *State v Antone,* 62 Hawaii 346; 615
P2d 101 (1980). Similarly, Alaska continues to rely
on a pre-*Strickland* test for prejudice that requires
the defendant to show that his attorney's incompe-
tence "contributed to the conviction." *Wilson v
State,* 711 P2d 547, 549 (Alas App, 1985); *Jackson
v State,* 750 P2d 821, 824-825 (Alas App, 1988).

The approaches taken by these jurisdictions
have in common a refusal to focus entirely on the
effect an attorney's errors have on the outcome.
Instead, the various tests allow an inquiry into
whether a defendant had a meaningful opportu-
nity to have counsel's assistance in presenting a
defense. While this is an appropriate inquiry, it
must be tempered by the policy concerns under-
lying the harmless error rule.

I believe that the proper balance is struck by the
following proposed standard for prejudice. To suc-
cessfully claim ineffective assistance of counsel, a
defendant must show that his attorney's incompe-
tence has deprived him of an otherwise available
and likely meritorious defense.

To meet this standard, a defendant must show
either that his attorney's errors precluded putting
forth a likely meritorious defense altogether, or
that the errors in presenting what would likely
have been a meritorious defense were so serious
that the defendant was in essence denied the right
to have the assistance of counsel as envisioned by
Const 1963, art 1, § 20.

The majority's criticism of my proposed refine-
ment to the *Strickland* prejudice prong reflects a
basic misunderstanding of both *Strickland* and my
proposed test. The majority contends that under
my proposed test, "[c]onvictions would be over-
turned because convicted criminals could legally
argue that defense counsel should have chosen
other avenues of defense that, although tenable,

did not have a reasonable probability of affecting the jury's verdict." *Ante* at 325. It further contends that an attorney could be found ineffective for choosing the "better course." *Id.* Such contentions ignore the first prong of the *Strickland* test. If indeed a defense attorney chose not to pursue a line of defense that did not have a reasonable probability of affecting the jury's verdict, or was in fact the better course, the first prong of the *Strickland* test would not be satisfied.[6] Therefore, the issue of prejudice would not even be reached.

Further, the majority undertakes an excessive "original intent" analysis to criticize my proposed refinement of *Strickland*'s prejudice prong. The analysis is curious in two respects. First, because the concept of ineffective assistance is fairly recent, there is not a lot of history to draw upon in evaluating the appropriate test to apply in Michigan. There is no evidence that *Strickland*'s prejudice standard was thought of until 1984, when the Supreme Court invented it. It was not in the minds of the framers of the United States Constitution or the Michigan Constitution of 1963. Yet, the majority suggests that without sufficient historical jurisprudence, this Court must blindly adopt, verbatim, the test espoused by the United States Supreme Court.

Second, the majority implies that my proposed standard constitutes "the creation of rights from whole cloth." *Ante* at 322. Rather, my proposed standard is merely a refinement of the *Strickland* test, which as demonstrated by the dissent is capable of differing interpretations. It is appropri-

---

[6] Similarly, contrary to the majority's suggestion, a "good" plea bargain accepted by a defendant on the sound advice of his attorney would not form the basis of a successful ineffective assistance claim because the first prong of the test would not be satisfied. An attorney who chooses a "good" strategy would meet the competency requirements of the first prong.

ate for this Court to refine and clarify United States Supreme Court jurisprudence in light of the past history and jurisprudence of this state. Indeed, it is our duty. The majority's narrow application of *Sitz* severely constricts our ability to answer this calling.

II

Having analyzed and described my proposed test, I now turn to the facts presented in these consolidated cases.

While I agree with the Court of Appeals that the performance of Mr. Pickens' trial attorney was deficient, his claim cannot succeed because he has not shown that he was prejudiced by his counsel's errors.

Attorney Greenberg indicated to Judge Moore that she intended to call the alleged alibi witness, Mr. Wright. Her own testimony at the *Ginther* hearing disclosed that she was aware of Wright's potential alibi testimony nearly three months before trial. Her failure to file a timely notice of alibi and failure to move for an adjournment in order to correct her error establishes a level of performance falling below the professional norm.

However, Mr. Pickens has failed to establish the required showing of prejudice. He was not able to show at the evidentiary hearing that the failure to secure the alleged alibi witness' testimony deprived him of an otherwise available and likely meritorious defense.

Although Mr. Wright was subpoenaed, he did not testify at the evidentiary hearing. Instead, for unexplained reasons, defense counsel waived the witness, stating that he had discussed the matter at length with Mr. Pickens. No evidence was ever presented at the evidentiary hearing to establish

that the alleged alibi witness would have indeed testified favorably to the defense at trial. Because there was no showing that an alibi defense, as might have been provided by Mr. Wright, would likely have been meritorious, the defendant has not shown prejudice. Therefore, the decision of the Court of Appeals should be reversed.

Mr. Wallace's ineffective assistance claim likewise fails under my proposed test. Although he voices numerous complaints about his counsel's performance, for purposes of analysis I will combine them into three categories.

First, defendant Wallace complains that his attorney failed to properly prepare and present an insanity defense. Second, and related to the first complaint, Mr. Wallace claims ineffective assistance because his attorney "failed to recognize, failed to investigate, failed to file the statutory notice and failed to prepare a diminished capacity defense . . . ."

Attorney Graziotti's alleged deficient performance in preparing and presenting the insanity and diminished capacity defenses overlap to a large degree. I will therefore discuss these two categories together. Diminished capacity is a specialized form of the insanity defense. It focuses on the role of alcohol and substance abuse in the claimed mental illness. While attorney Graziotti abandoned the specific specialized defense, he was still able to present evidence of alcohol and substance abuse in developing the more general insanity defense.

The primary theory of the defense was that the defendant had committed the crime while insane and under provocation. Mr. Graziotti indicated to the court that he did not want the diminished capacity instruction because he felt that the first part of the instruction might dissuade the jurors

from finding the defendant insane.[7] While the record reveals that Mr. Graziotti could have done a better job of presenting the insanity defense, we cannot determine that his decision not to focus on the alcohol and substance abuse aspect of the insanity defense was not made for reasons of sound trial strategy. Therefore, I cannot conclude that in light of all the circumstances his performance was "outside the wide range of professionally competent assistance." *Strickland,* ·466 US 690.

Furthermore, Mr. Wallace's claim of ineffective assistance based on the alleged errors in his attorney's handling of the insanity defense fails because prejudice has not been established.

Nothing new was adduced at the *Ginther* hearing to indicate that counsel's poor presentation of the insanity defense deprived the defendant of a likely meritorious defense. After reviewing the entire transcript of the *Ginther* hearing, I agree with the prosecutor's statement that "the jury heard everything the experts had to say in this case; if there was more the jury should have heard, from Dr. Bhama, or from the prosecution's experts, by way of cross-examination, this 'extra'

---

[7] The jury instruction on diminished capacity is as follows:

 (1) A person who is under the influence of voluntarily consumed [alcohol/(and/or) controlled substances] at the time of the alleged offense is not for that reason alone to be judged legally insane.

 (2) However, a person may be mentally ill and intoxicated, with both conditions affecting his actions. It is for you to judge whether, under all of the circumstances, the defendant was mentally ill at the time of the offense, and then to apply the further tests of whether or not the defendant was legally insane. [CJI 7:8:02.]

At the *Ginther* hearing, Mr. Graziotti explained that because evidence was presented refuting that his client was intoxicated at the time of the shooting, he felt the instruction would be detrimental to his client's case.

information was never brought out at the *Ginther* hearing. In other words, Defendant has not established prejudice."

Likewise, no prejudice resulted from attorney Graziotti's failure to pursue diminished capacity. As already mentioned, lack of specific instructions regarding this defense did not preclude development of the theory that defendant's long-term alcohol and substance abuse contributed to the temporary insanity he experienced at the time that he shot his wife. Because this theory was adequately presented by counsel, and rejected by the jury, a further instruction on diminished capacity would not have aided the defendant.[8]

Finally, defendant complains of his counsel's general incompetence and ignorance of the criminal law. He cites several specific shortcomings. For instance, Mr. Graziotti demonstrated a lack of familiarity with basic rules of procedure and basic rules of law. He had to consult written notes and reference material to answer questions put to him by appellate counsel on basic rules of evidence and procedure. He insisted to the jury and the court that second-degree murder was a specific intent crime. He asked the trial court who was supposed to bring a directed verdict motion, and what was the order of closing arguments. Mr. Graziotti's explanations at the *Ginther* hearing for these specific examples of alleged incompetence at trial were that he was just trying to engage the court in conversation.

Defendant also complains about attorney Graziotti's untruthfulness, either at the *Ginther* hearing, or during trial, regarding when he obtained

---

[8] This is also true because a necessary component of the diminished capacity defense is that the defendant was mentally ill. The jury rejected such a finding when it rejected the guilty but mentally ill verdict.

and reviewed a crucial prosecution expert's report. At trial he stated that he did not know Mr. Kolito's report would be used and had not studied it or discussed it with the defendant until the night before trial. However, when confronted with his trial statements at the evidentiary hearing he explained that he had gotten the report and had immediately studied it with defendant some eleven days before the trial and that his assertions to the court were merely an attempt to "try and lean on the court" for more time.

There is no need to discuss whether these instances of alleged incompetence deprived defendant of the "counsel" envisioned under the Sixth Amendment, *Strickland,* 466 US 687. Again, the defendant has not shown that these complaints resulted in prejudice. As noted by the prosecution, "The trial judge properly instructed the jury on the elements of first- and second-degree murder; a motion for directed verdict would have surely been denied; and closing arguments proceeded in the order they were supposed to."[9]

Because defendant has not shown that his attorney's performance deprived him of an otherwise available and likely meritorious defense, I would find that his ineffective assistance claim must fail.

LEVIN, J. (*concurring in* Pickens *and dissenting in* Wallace). I join in affirming Dwayne Pickens' conviction because he was not denied the effective assistance of counsel.

I would hold, however, that Ralph Wallace was

---

[9] I am sympathetic to the defendant's claim that because of attorney Graziotti's inadequacies, "he brought an aura of unprofessionalism that reflected so badly on the Appellant and his defense." However, the defendant has done no more to show prejudice than to make a bare allegation that "because of counsel's serious mistakes, he was substantially prejudiced thereby and but for same may have had a strong likelihood of acquittal." *Id.*

prejudiced by his lawyer's deficient representation, and would reverse the judgment of the Court of Appeals and remand for a new trial.

I

Judicial vindication of the right to the effective assistance of counsel reduces the risk that an innocent person was convicted, and provides some assurance that a conviction was obtained through fundamentally fair procedures.[1] The standard for determining whether there was ineffective assistance of counsel should seek to secure procedural fairness, and legal representation that enables an accused to meet the charges.

The majority adopts the standard for determining ineffective assistance set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The majority expounds a textual and historical analysis of Michigan's adoption of the substance of the Sixth Amendment, citing state constitutional and common-law history, state law before adoption, structural differences between the state and federal constitutions, and matters of peculiarly state or local interest.[2]

The issue in *Strickland* concerned federal habeas corpus relief for ineffective assistance rendered at the sentencing phase of a state murder conviction. This Court, in arriving at a fair and workable standard may seek guidance from federal law, but is not bound to do so, as the majority explains.[3]

A federal constitutional standard is necessarily

_____

[1] *Strickland v Washington*, 446 US 668, 708; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (Marshall, J., dissenting). See also *United States v Decoster*, 199 US App DC 359, 454-457; 624 F2d 196 (1976) (en banc) (Bazelon, J., dissenting).

[2] *Ante*, pp 319-320.

[3] *Ante*, pp 312-314.

a minimum standard. Otherwise, the United States Supreme Court would be imposing its own policy preferences on the fifty states. It is understandably reluctant to do so.

The states are free to apply a standard higher than the federal standard for habeas corpus relief, a standard higher than the standard required by the United States Supreme Court of the least progressive state in the union.

It appears that a few states, Alaska,[4] Hawaii,[5] Massachusetts,[6] have adopted a standard more

---

[4] *Wilson v State,* 711 P2d 547, 549 (Alas App, 1985). To obtain postconviction relief on the basis of a claim of ineffective assistance of counsel, a defendant must establish that counsel's conduct either generally throughout the trial or in one or more specific instances did not conform to the standard of competence displayed by a person of ordinary training and skill in the criminal law, and that the lack of competency contributed to the conviction. (Citing *Risher v State,* 523 P2d 421 [Alas, 1974].)

The appellate court declined to rule on the merits of defendant's ineffective assistance challenge, as the trial court failed to articulate a test of prejudice. If, as the defendant claimed, an actual conflict of interest existed, prejudice would be presumed and the conviction reversed. *Cuyler v Sullivan,* 446 US 335; 100 S Ct 1708; 64 L Ed 2d 333 (1980).

[5] *State v Smith,* 712 P2d 496 (Hawaii, 1986). In reversing a conviction on the basis of ineffective assistance of counsel, the Hawaii Supreme Court ruled that a claim of inadequate assistance will be sustained only if defendant can show specific errors or omissions reflecting counsel's lack of skill, judgment or diligence, and that the error or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. *Id.,* p 501.

The court held that defense counsel's direct examination of the defendant eliciting testimony of six prior burglary convictions and his habit of exposing himself in a prosecution for sodomy was outside the range of professional competence. The errors reflected counsel's lack of skill substantially impairing a potentially meritorious defense. *Id.,* p 502.

[6] *Commonwealth v White,* 409 Mass 266, 272; 565 NE2d 1185 (1991). To prevail on a claim of ineffective assistance of counsel, defense counsel's performance must fall measurably below that which might be expected from an ordinary fallible lawyer, and that the defendant's case was prejudiced by counsel's conduct by a likely deprivation of an otherwise available, substantial ground of defense, citing *Commonwealth v Saferian,* 366 Mass 89, 96; 315 NE2d 878 (1974).

The Supreme Judicial Court of Massachusetts affirmed the convic-

protective of the right to the effective assistance of counsel than the one set forth in *Strickland.*

I would, for reasons stated in part v, adhere to the standard set forth in *People v Garcia,* 398 Mich 250; 247 NW2d 547 (1976).[7]

II

A reviewing court is obliged to examine the record to determine whether a convicted defendant claiming ineffective assistance was fairly represented by counsel. Such review will not indulge hindsight analysis of strategy, nor require perfect representation. Whatever test is applied, be it *Strickland, Garcia,* or the former "sham and mockery" test,[8] a reviewing court should examine the challenged representation in light of the purpose of the Sixth Amendment. The inquiry should focus on the fundamental fairness of the proceeding.[9]

To justify reversal under the *Strickland* standard, a convicted defendant must show that the lawyer's "performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." The convicted defendant must further show that

tion, as the lawyer's failure to call and interview two witnesses was within legitimate trial strategy, and therefore not prejudicial.

[7] In *Garcia,* this Court adopted the standard for evaluating Sixth Amendment claims of ineffective assistance set forth in *Beasley v United States,* 491 F2d 687, 696 (CA 6, 1974).

Under *Garcia,* a defendant's lawyer must perform at least as well as a lawyer with ordinary training and skill in the criminal law, and must conscientiously protect his client's interests, undeflected by conflicting considerations. Prejudice is not presumed once this test is met. A defendant would be entitled to a new trial only if, but for the attorney's error, the defendant would have had a reasonably likely chance of acquittal. *People v Degraffenreid,* 19 Mich App 702; 173 NW2d 317 (1969) was cited.

[8] *Williams v Beto,* 354 F2d 698 (CA 5, 1963).

[9] *Strickland, supra,* p 686.

the "deficient performance prejudiced the defense
. . . ." This requires "showing that counsel's er-
rors were so serious as to deprive the defendant of
a fair trial, a trial whose result is reliable. Unless
a defendant makes both showings, it cannot be
said that the conviction . . . resulted from a
breakdown in the adversary process that renders
the result unreliable."[10]

### A

The errors of Wallace's lawyer were objectively
unreasonable and prejudicial. The prejudice in this
case arose from the failure to present a diminished
capacity defense, coupled with cumulative lawyer
errors concerning procedural and substantive law.
Serious lawyer error pervaded the trial, undermin-
ing confidence that the verdict convicting Wallace
of first-degree murder was based on the evidence
rather than a "breakdown of the adversarial pro-
cess."

The defense presented two theories: Wallace was
legally insane as a result of long-term alcohol
abuse and organic brain syndrome, and Wallace
was guilty at most of manslaughter based on
legally adequate provocation of marital infidelity.

Before the opening statements, the trial judge
asked Wallace's lawyer several times whether he
was offering a diminished capacity defense. After
the lawyer's evasive and confusing responses to

---

[10] *Strickland, supra,* p 687.

The two-part *Strickland* test for ineffective assistance requires that
defendant show that counsel's representation was objectively unrea-
sonable, based on the facts and circumstances of a particular case.
The defendant must also show that the deficient performance preju-
diced the defense. To establish prejudice, defendant must show that
there is a reasonable probability that, but for the counsel's unprofes-
sional errors, the result of the proceeding would have been different.
A reasonable probability is a probability sufficient to undermine
confidence in the outcome. *Id.,* pp 689, 694.

the judge's questions, the judge said that, absent direction from the defense, he would not provide an instruction on diminished capacity.

The jury was instructed on first-degree murder, second-degree murder, not guilty by reason of insanity, guilty but mentally ill, and voluntary manslaughter.

The majority concludes that Wallace was not prejudiced because evidence of "guilt was truly overwhelming."[11] The concurring opinion states that the author was unable to determine that the lawyer's decision "not to focus on the alcohol and substance abuse aspect of the insanity defense was not made for reasons of sound trial strategy."[12]

The lead and concurring opinions thus ignore that factual guilt was not an issue. Wallace admitted shooting his wife. The sole issue was the degree of criminal responsibility and the level of culpability.

B

The evidence, both lay and expert, supported a diminished capacity defense.[13] Wallace's psychiatric expert, who was also his treating physician, testified that Wallace suffered from organic brain

[11] *Ante,* p 330 (opinion of Riley, J.).

[12] *Ante,* p 354 (opinion of Mallett, J.).

[13] Wallace's lawyer testified at the *Ginther* hearing that he chose not to request an instruction on diminished capacity because it would confuse the jury. He testified that he wanted the jury to find his client insane—"so why would I want . . . the Judge to read a person who is under the influence of voluntarily consumed alcohol or controlled substance at the time of the alleged offense is not for those reasons alone to be judged legally insane?"

Wallace's lawyer did not understand that a diminished capacity defense allows the jury to reach the issue of insanity, combining the effects of past mental illness/retardation and substance abuse as contributory factors to legal insanity. This corresponds to the findings of Dr. Bhama, and was partially corroborated by the forensic center responsibility examination.

syndrome, brought about by long-term alcohol abuse. Dr. Bhama reported Wallace's IQ as 82, considered dull/normal on the basis of objective medical testing, and corroborated his findings with a CT scan. Dr. Bhama testified that Wallace had suffered hallucinations and blackouts from 1982 to 1983.[14]

Dr. Bhama opined that Wallace suffered from mental illness, a substantial disorder of thought or mood, that prevented him from conforming his conduct to the requirements of the law. The essence of the psychiatrist's opinion was that alcohol abuse syndrome and resultant physical deterioration of the brain over a forty-year period caused the underlying mental illness, rendering Wallace insane at the time of the shooting.

Wallace and his supervisor, Larry Truxal, testified that Wallace had taken a prescription tranquilizer on the day of the shooting, and that Wallace was unusually agitated and incoherent just hours before the murder. Wallace testified regarding an hallucination that occurred moments before the shooting, and that he could not recall the sequence of events immediately before or after his wife's murder.

The lawyer acknowledged that he was aware that Wallace's IQ was in the 80's, of Wallace's history of hallucinations, drug and alcohol abuse, previous inpatient psychiatric hospitalizations, and of his use of Elavil, Tolectin, and Serax, prescription medications prescribed for another person, and ingestion of two to eight beers shortly before the shooting.

Wallace's lawyer was alerted to the possibility that diminished capacity might provide a defense well in advance of trial. The prosecutor's expert

---

[14] Dr. Bhama saw Wallace both as an outpatient and an inpatient during this period.

psychologist recommended a diminished capacity evaluation at a pretrial hearing on forensic testing two months before trial. At the hearing on Wallace's motion for a private forensic evaluation, his lawyer said that the results of such an evaluation would be delivered to the prosecutor, and referred "specifically to the diminished capacity so that he'll be aware of it, so that he won't overlook that."

During voir dire, Wallace's lawyer informed prospective jurors that they would hear testimony concerning a diminished capacity defense. Although Wallace's lawyer indicated to the judge that he was not advancing a diminished capacity theory, he argued in opening that, at the time of the murder, longstanding alcohol addiction, pre-existing mental illness, coupled with prescription medication and an hallucination at the bar where he shot his wife, resulted in his client not functioning at "full capacity," and that he thus was not guilty of first-degree murder.[15]

The prosecutor's expert witnesses testified that while Wallace did indeed suffer from long-term alcohol abuse and had an IQ of 89, he was not legally insane. On the basis of the sequence of events and the eyewitness testimony,[16] it is not

---

[15] During the discussion of jury instructions, the prosecutor observed that, although Wallace's lawyer had submitted instructions concerning a diminished capacity defense, the lawyer had before the trial specifically rejected diminished capacity as a defense. The ensuing discussion illustrates the lawyer's utter confusion, or his all-too-late realization that the evidence supported a defense of diminished capacity.

[16] There was credible testimony that Wallace appeared in control and lucid at the time of the murder. There was evidence of premeditation. Wallace worked full time as an electrical inspector and otherwise conducted his daily affairs in an outwardly normal manner. A neighbor of Wallace's testified that several days before the shooting, Wallace said he would kill his wife to end his marital difficulties. Wallace brought a .357 magnum to the bar where he shot his wife.

Employees and bar patrons testified that Wallace sat with his wife,

surprising that the jury rejected the insanity defense and found Wallace sane.

Wallace's lawyer failed to marshal the medical evidence and facts preceding the murder to mount a coherent defense. He erroneously stated at the *Ginther* hearing that insanity and diminished capacity are mutually exclusive defenses. Although the standard jury instruction respecting the diminished capacity defense had been brought to his attention by the judge, and explained by the prosecutor, Wallace's lawyer rejected, without reason, a substantial defense.

The decision of Wallace's lawyer not to pursue a diminished capacity defense cannot be regarded as sound trial strategy. Dr. Bhama's testimony, and Wallace's and Truxal's testimony of alcohol and drug consumption, supported a defense that Wallace was unable to form the requisite specific intent at the time of the murder.

Had the jury been instructed on diminished capacity, the jurors would have deliberated on whether the combined effects of retardation, preexisting mental illness, alcohol abuse syndrome, tranquilizers and the documented psychiatric history rendered Wallace unable to form the specific intent for first-degree murder.

The lawyer said he did not present a diminished-capacity defense because, as he explained at the *Ginther* hearing, "I felt I didn't want to present them. Those I left out, I left out on purpose. I didn't feel they were that good." It appears that

---

quietly drinking and talking for some time, before he fired the first shot. Eyewitnesses recounted that Wallace shot his wife a second time as she fell to the floor, and finally fired a third shot into her motionless body beneath a table. The second and third shots were anywhere from one to five minutes apart. Wallace calmly placed his gun on the table and went to the restroom. When he emerged, he submitted to arrest, telling the police that he had shot his wife.

the lawyer simply was not aware, nor did he understand the significance of the defense. "I want to confess to you that in the case I was arguing here, I thought his instructions were fine. And if he had confusion, the Judge, I added to his confusion. My hope was that confusion would benefit Mr. Wallace."

C

Diminished capacity is in the nature of a mitigation defense, reducing first-degree murder to a lesser offense as a result of a jury finding that specific intent was not established beyond a reasonable doubt. In the instant case, the jury might have accepted, if instructed, a diminished capacity defense, which allows the jury to consider past history of mental illness and retardation coupled with consumption of alcohol and medication. Failure to present mitigation evidence in a capital case is objectively unreasonable and prejudicial to the accused.

State and federal courts, applying a *Strickland* analysis, have accorded special consideration to mitigation claims, at both the guilt and sentencing phases. Counsel's failure to investigate or present evidence of mental illness, or other "humanizing" mitigation factors has been held to constitute ineffective assistance.[17]

The New Jersey Supreme Court reversed a conviction in which the lawyer failed to recognize and pursue a diminished capacity defense, finding error requiring reversal at both the guilt and the

---

[17] *Waters v Zant,* 979 F2d 1473 (CA 11, 1992); *Evans v Lewis,* 855 F2d 631 (CA 9, 1988). Failure to fully investigate cannot be characterized as a trial tactic, and the omission of relevant and material evidence at sentencing seriously undermined confidence in the outcome, requiring reversal.

sentencing phases.[18] With overwhelming evidence of mental disturbance,[19] the lawyer's failure to pursue the defense was found to have materially contributed to the conviction, and that there was a reasonable probability that the result at the guilt phase would have been different. The court vacated the sentence for failure to interview potential witnesses regarding mental state, although the lawyer knew that the defendant was previously hospitalized with a psychiatric diagnosis.

Failure to assert a statutorily available defense supported by evidence was found to be error requiring reversal under a *Strickland* analysis by the Texas Court of Criminal Appeals.[20] Because the jury was precluded from giving effect to the defense, "[t]hat in itself undermines our confidence in the conviction sufficiently to convince us that the result of the trial might have been different had the instruction been requested and given."[21]

In the instant case, the lawyer's failure to assert an available, meritorious defense, with significant factual and legal support, similarly undermines confidence in the verdict, satisfying the prejudice prong of an ineffective assistance claim.

III

A court may find prejudice on the basis of the totality of counsel's errors and omissions.[22] The

---

[18] *State v Savage,* 120 NJ 594, 622; 577 A2d 455 (1990).

[19] The defendant carried the victim's dismembered torso in a suitcase for days, attempted suicide while hospitalized, and had a history of cocaine use.

[20] *Vasquez v State,* 830 SW2d 948 (Tex Crim App, 1992).

[21] *Id.* at 950. See also *Watrous v State,* 842 SW2d 792 (Tex App, 1992), in which the court reversed a sexual assault conviction because the attorney failed to request an instruction on a statutory defense.

[22] *Mak v Blodgett,* 970 F2d 614, 622 (CA 9, 1992), citing *Ewing v Williams,* 596 F2d 391, 395 (CA 9, 1979) (prejudice may result from

failure of Wallace's lawyer to raise the viable diminished capacity defense was only one error among many. Cumulative error is evident in the lawyer's lack of preparation, and ignorance of basic principles of substantive and procedural law.[23]

A

Wallace's lawyer made numerous errors of law. He did not understand the difference between first- and second-degree murder.[24]

the cumulative effect of multiple deficiencies), citing *Cooper v Fitzharris,* 586 F2d 1325 (CA 9, 1978) (en banc), cert den 440 US 974 (1979).

Habeas corpus relief was granted in *Harris v Dugger,* 874 F2d 756 (CA 11, 1989), on the basis of cumulative error. Because there was a reasonable probability that the jury would have rejected the death penalty in light of favorable evidence, the defendant was prejudiced by his lawyer's omissions. Accord *Horton v Zant,* 941 F2d 1449 (CA 11, 1991); *Cave v Singletary,* 971 F2d 1513 (CA 11, 1992), the failure to present favorable evidence and witnesses at sentencing greatly undermined the jury verdict, establishing prejudice.

[23] At the *Ginther* hearing, the lawyer repeatedly misstated the rules of evidence. Midtrial, the judge gave the lawyer a book of the Michigan Rules of Evidence after various baseless objections. At the *Ginther* hearing, the lawyer testified, "Not all objections were made based upon my knowledge or expertise or lack thereof. Lots of times, I was trying to do things to grandstand for the Jury. I was often trying to interrupt and sometimes trying to confuse."

The lawyer also testified that "[a]fter twenty years in this business, I can tell you something, I am more confused now than I was the day I got out of law school, okay."

Errors of omission included the lawyer's failure to cross-examine the forensic psychologist on his conclusion that Wallace did not suffer from acute mental organic disorder, a conclusion that contradicted Wallace's expert testimony. The lawyer failed to provide his own expert with police reports in preparation for trial.

[24]  [*Lawyer*]: I would ask the Court that it instruct the Jury that part of Second Degree Murder includes plan, purpose, premeditation.

  [*The Court*]: That's not the law, Mr. [Wallace's lawyer].

  [*Lawyer*]: I think that instruction should be given.

  [*The Court*]: That's not the law.

  [*Lawyer*]: What is the law?

  [The Court explains the elements.]

  [*Lawyer*]: Requests malice aforethought instruction for sec-

Wallace's lawyer did not know that the trial judge hears a motion to disqualify the judge.[25] He was also unaware that a forensic evaluation was required within sixty days of filing notice of intent to raise an insanity defense. He incorrectly characterized his questions and comments during voir dire as "testimony," and was surprised to learn that the court is required to instruct on second-degree murder in a first-degree murder prosecution.

Wallace's lawyer did not know, until informed by the judge, that a defendant, not the prosecutor, moves for a directed verdict. His ignorance regarding the purpose of opening statement was apparent in his objection to the prosecutor's "telling of the whole story" in his opening statement, and in his request for the same "leeway" when it was his turn for opening statement.

Wallace's lawyer did not understand the Rules of Evidence. He repeatedly offered hearsay testimony and documents that were hearsay during the five-day trial.[26] In responding to numerous hearsay objections, he merely requested "a little latitude from the court," and not once cited a specific exception to the hearsay rule.

He misunderstood MRE 404. On numerous occasions, he sought to introduce irrelevant character evidence concerning the victim.[27] When cautioned by the Court that certain character evidence was prohibited under "404," he asked "Michigan Court Rule?"

---

ond degree murder—Court refuses, [Lawyer] want[s] objection on the record.

[25] MCR 2.003(C)(3).

[26] He argued, in response to the prosecutor's hearsay objection, "[i]f two men are both in the room and I'm asking him to tell the conversation they had at that time . . . ."

[27] Ten-year-old incidents of work absenteeism, for example.

Wallace's lawyer was unaware that an expert can testify about his opinions based on a previously prepared report. He seemed similarly unaware that a trial transcript could be made available to the defense upon request. In closing, he improperly referred to possible punishment for first-degree murder. He made what the judge called a "glaring mistake"—he submitted a proposed jury instruction that requested that Wallace be placed in an institution for treatment of the insane.

B

Wallace's lawyer failed to prepare adequately for trial. He did not provide Dr. Bhama with psychiatric testing data from the Recorder's Court forensic evaluation that Dr. Bhama had requested. This was a serious error of omission, as Wallace's mental state was crucial to the defense.

In a first-degree murder prosecution, with insanity as the central defense, Wallace's lawyer was unable to provide a factual basis for his proposed irresistible impulse theory during a pretrial hearing where he sought authorization for private forensic testing, prompting the court's expression of astonishment at the degree of unpreparedness in a capital case. He admitted at trial to neglecting to read a statement of a prosecution witness that had been provided before trial.

C

Wallace's lawyer's demeanor was unprofessional and provocative. He objected to the prosecutor's "third grade questions," and accused the court of making gestures indicating boredom or displeasure with the defense. He charged the court reporter

with purposely withholding transcripts, and interrupted the prosecutor's lengthy closing argument by asking for a glass of water so that he could stay awake. On redirect examination of his witness, Dr. Bhama, he asked three times if Dr. Bhama was to be paid for his time in court. He then dismissed his own expert witness saying "You're too expensive to keep here."

Those comments illustrate an appalling lack of respect for the court, and a capacity for self-inflicted damage evident throughout the trial.

### D

The cumulative effect of the lawyer's ignorance of basic law critical to his client's case, inadequate factual preparation, and unacceptable use of "confusion" as a trial strategy, undermines confidence in the verdict.

Wallace was prejudiced by his lawyer's deficient performance, for there was a reasonable probability that the conviction of first-degree murder was the result of the lawyer's failure to present and to seek an instruction on a mitigating defense, coupled with the cumulative error at trial.

I would reverse Wallace's conviction, and remand for a new trial.

### IV

Pickens was convicted of delivery of less than 50 grams of cocaine in a controlled purchase. His defense was alibi. In her opening statement, Pickens' lawyer told the jury that she had an alibi witness. The trial judge refused to permit her to present the alibi witness because she had not filed

the required statutory notice.[28] The arresting officers testified at trial that the marked $20 bill was found on Pickens' person when he was arrested.

The Court of Appeals remanded for a *Ginther* hearing. Pickens lawyer was the sole witness. She testified that she knew of the alibi witness two months before the trial, and directed her investigator to interview and subpoena him.

Pickens failed, however, to establish that the deficient representation created a reasonable probability that the verdict was a result of the failure to produce the alibi witness. When the alibi witness failed to appear at an adjourned *Ginther* hearing, Pickens waived production of the witness, indicating to the court's satisfaction that he fully understood the consequences. There is no evidence that the alibi witness would have testified favorably.[29] Absent prejudice, and being persuaded that the verdict followed a fundamentally fair trial, I join in affirmance of his conviction.

V

The right of an indigent criminal defendant to the appointment of counsel, as set forth in *Recorder's Court Bar Ass'n v Wayne Circuit Court,* 443 Mich 110; 503 NW2d 885 (1993), is statutory. Before *Gideon v Wainwright,* 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963), circuit judges appointed assigned counsel in appropriate cases at public expense.

The supervision of the administration of justice in this state is confided to this Court under article 6 of this state's constitution. This Court has broad power and responsibility at every level. Lawyers are admitted to practice, and permitted to con-

---

[28] MCL 768.20(1); MSA 28.1043(1).

[29] Compare *People v Pearson,* 404 Mich 698; 273 NW2d 856 (1979).

tinue to practice, under authority conferred by this Court.

Although a statute confers on the trial bench the authority to appoint a lawyer,[30] that power, like all power confided to trial and intermediate appellate court judges, is subject to the supervisory power of this Court.

Ineffective assistance of counsel is a continuing problem in part because, unfortunately, too many lawyers who accept assignments to represent indigents or accept money as retained counsel to represent persons that become involved in the criminal justice system do not, in fact, perform adequately. Neither the trial bench nor the Court of Appeals nor this Court has put in place a meaningful system for removing inadequate lawyers from the rosters of lawyers eligible to represent defendants in criminal cases.[31]

I do not mean to suggest that the problem is readily solvable. The counties are expected to fund indigent defense. The compensation is generally inadequate. It is difficult to raise standards. But nothing meaningful has been done, although many of us have been talking about it for at least twenty-five years of which I am aware.

The problem is further exacerbated by the continuation of the patronage system in Recorder's Court and many other courts. I do not mean to

---

[30] MCL 775.16; MSA 28.1253.

[31] As Anthony Lewis observed after the *Gideon* decision:

It will be an enormous social task to bring to life the dream of *Gideon v Wainwright*—the dream of a vast, diverse country in which every man charged with crime will be capably defended, no matter what his economic circumstances, and in which the lawyer representing him will do so proudly, without resentment at an unfair burden, sure of the support needed to make an adequate defense. [Gideon's Trumpet, p 205.]

suggest that unqualified lawyers are generally appointed, but rather that far too many unqualified lawyers continue to be appointed.

I find it most difficult to join in a standard for determining ineffective assistance of counsel that places the burden on the defendant—often uneducated, without resources, financial or familial—to show that omissions and errors of a lawyer, licensed by this Court to accept his retainer[32] or public funds for his defense, in fact prejudiced the outcome.

This Court has failed to provide indigent persons with a realistic opportunity to obtain effective legal representation and advocacy in this Court of their claims, although a commitment was made over four years ago to do so.[33]

---

[32] Wallace's lawyer was retained.

[33] Administrative Order No. 1990-2, ¶ 2(C)(3)(b); Mich Ct R, pp A 1-42 to A 1-43.