# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ONTARIO MCDOWELL,

        Defendant-Appellant.

UNPUBLISHED
February 21, 2017

No. 329818
St. Clair Circuit Court
LC No. 15-001223-FH

Before: GLEICHER, P.J., and MURRAY and FORT HOOD, JJ.

PER CURIAM.

A jury convicted defendant of possession with intent to deliver methamphetamine in violation of MCL 333.7401(2)(b)(i). Defendant challenges the introduction of drug-seller profile evidence at his trial. Although the prosecution crossed the line of permissible use of this type of evidence, its admission was harmless in light of the otherwise proper evidence of defendant's guilt. We affirm.

## I. BACKGROUND

On May 7, 2015, Port Huron police officers executed an arrest warrant and took defendant into custody as he walked down a public street. The officers conducted a pat-down search and uncovered three cell phones, $10.25 in cash, a black box containing a glass pipe and some straws, a corked glass vial containing a crystalline substance, and a black velvet bag filled with small "bindles" of a similar substance. The arresting officers placed these items into evidence for examination by an officer with specialized narcotics training, Officer Ryan Mynsberge.

Officer Mynsberge completed advanced training regarding methamphetamine and became "basically the expert[] of our department" on that topic. Mynsberge described that the glass pipe was fashioned from a water tube used by florists. Mynsberge continued that on one side of the tube "there is some . . . charring or, and the black smoke that is in the hole portion or the rounded portion . . . . And then there's also some smoke or charring going down the tube itself. . . ." The other side of the tube was discolored white. Mynsberge testified, "[t]ypically methamphetamine is smoked in those pipes." He believed the pipe had been used for that purpose as "obviously some heat [was] applied" which "melted" one "end."

-1-

Inside the black velvet bag, Mynsberge found "nine paper bindles," paper folded into small envelopes. In Mynsberge's experience, such packages usually contain heroin. The contents in this case, however, were "more like crystals." Later testing revealed that the substance was crystal meth. Each bindle contained approximately 0.08 grams of the substance. The corked glass vial also contained "crystals."

Mynsberge described how meth production has been simplified over the years, creating a more widespread problem. An individual can manufacture meth with a two-liter bottle, pseudoephedrine tablets, and a small number of other ingredients. As the purchase of pseudoephedrine is now heavily monitored, meth manufacturers recruit others to purchase this ingredient, which is colloquially referred to as "boxes."

In relation to the meth market, Mynsberge testified that the drug is often referred to as "glass, ice or crystal," and its production as "cook or bake" or "a shake and bake." Meth costs approximately $80.00 for one gram, Mynsberge asserted.

In relation to the 0.08-gram bindles uncovered in this case, Mynsberge explained, "Yes, that's typically a user's quantity. One of those bindles would be a user's quantity. Usually typically around $20.00 for a bindle." Questioning by the prosecutor continued:

> *Q.* [W]hen we talk about the amounts that we're looking at here, when we've got the nine pre-packaged bindles and this little corked bottle with some crystal, . . . *in your training and experience are these consistent with packaging for sale or for personal use and could you explain that to us*?

> *A.* Ah, looking at that that's a combination of both. *Inside that glass vial is a person's personal use. Inside of the nine individually packaged bindles would be what somebody would probably distribute.*

> *Q.* Is it unusual in your experience, Officer Mynseberge, to have a user that's also selling?

> *A.* No, in fact that's quite normal to help support their habit they'll sell the product as well. They'll keep some for themselves and they'll also sell it to help support their habit.

> *Q.* And when we're talking about a bindle being approximately $20.00. . . . But if, if we're talking about that amount [nine bindles] is it your experience that, you know, a person who's using is going to have a large amount of money to be able to buy a large amount?

> *A.* If they don't have the product on them at that point it wouldn't be unusual to see them with the money[.] [W]hen they have the product on them[,] [t]hey're probably typically broke because they haven't sold any of it yet.

> *Q.* . . . [I]f they're just a user would they have enough to, to purchase, you know, an amount such as this?

*A*. That would be a lot for a user. [Emphasis added.]

On redirect, the prosecutor clarified regarding the possession of "bindles":

> *Q*. . . . Of course a, a seller could have them, a user could buy them. Why is it different in this case? What are you basing your opinion on that makes it different than, you know, his questioning about, well, of course if a user has them and a seller has them, why is it different here?
>
> *A*. It's the quantity of them. Typically if a person was going to purchase nine bindles of heroin or the amount of product that's in the nine bindles of heroin it just would have been in one package if it's the user purchasing that. Nine bindles is going to go, typically bindles are sold in threes. So those are going to go to three different users. Nine divided by three is three.

Mynsberge secured a search warrant to examine the contents of defendant's cell phones. Only one of the phones was operational and Detective Brian Kerrigan analyzed its contents. Kerrigan identified the phone as belonging to defendant as he was listed as "me" in the phone's "contacts" list and several "selfies" of defendant appeared in the camera roll.

In a messaging application, Kerrigan found a conversation referring to "coffee" in a context that appeared to be a reference to a drug transaction, later stating "Ok and I made 50 . . . Three for 50." In several others, defendant announced, "Got glass," a common reference for meth. In one conversation, defendant typed, "I'm not getting them don[e] shack no more I by a eight ball for 225." Kerrigan believed "shack" was a typographical error for "shake," a term used for meth manufacture. Defendant then referred to "GLass, 3and 1/2 grames," a term consistent with an "eight ball." Defendant informed the recipient, "I call you but you have to come to me," and "Got 3 20 for 50." Kerrigan testified that this was "significant" because "the 20 for 50 is trying to make a bargain, trying to sell two packets instead of one and giving him a little bit of a deal on the price." Kerrigan also found "several additional text messages with different people talking about ice or glass which is consistent with a slang term for crystal meth." In yet another conversation, defendant was searching for someone to secure "boxes," i.e. pseudoephedrine, for him. And the tenor of the messages suggested that the phone's owner was the manufacturer and seller, not the buyer—"And got good bake," "going fast," "Got 20 . . . How many you need," "I not doing to much of that stuff no more just here and there [t]o keep money in my pocket. . . ."

Like Mynsberge, Kerrigan testified that it was not unusual for someone to make meth both for sale and personal use. He explained that the "biggest hurdle" in the manufacturing process is securing pseudoephedrine and that "they'll exchange product for money for the boxes just to make their product." The prosecutor also inquired whether Kerrigan had "any opinion" on whether "the drugs we have in this case were packaged with the intent to deliver or personal use." Kerrigan opined:

> Well, the totality of the text messaging. When you go through these there's not going to be any blue messages going out from this phone indicating I need some money or I need some glass. I got glass, come and get it kind of messaging. And

it's messages going out indicating a price. You know, three for 50 or whatever you have. So, just from that itself he's looking for boxes in his message which indicates to me somebody that's cooking or making meth as well. And then the amounts. You know, you heard the, the text message talking about an eight ball or a three point five grams of meth that he's purchasing for $225.00. You in turn will turn around and break that down into pieces and you're going to make a considerable amount of money selling that in user quantities to individual users versus what you paid for an eight ball at one time.

A simple user, Kerrigan explained, could not afford such a large quantity.

Lieutenant Joseph Platzer testified that he supervised this investigation but did not take an active role. The prosecutor asked what the packaging used in this case "suggests to you." Platzer asserted:

> *With nine individual as we call them bindles that appears to be a dealer's quantity.* What we're seeing out on the street today is that people will buy one bindle for $20.00 or they'll get a, what they call a deal where they buy three for $50.00, which means that you buy three bindles at $20.00 each, they'll cut $10.00 off so they're getting three for $50.00. So that amount when they're individually packaged, that would appear to be a dealer's quantity of methamphetamine. [Emphasis added.]

The nine bindles found on defendant therefore would be worth between $150 and $180.

Defendant did not testify, but his defense theory was that he was a mere user of narcotics, not a dealer. The jury rejected this theory and convicted defendant of possession with intent to deliver. Defendant appeals.

## II. STANDARDS OF REVIEW

Defendant challenges the admission of expert opinion testimony characterizing him as a drug dealer. He notes that the testifying "officers profiled three types of persons involved with drugs: users, dealers, and user/dealers." Defendant asserts that he "would have no complaint" "[h]ad the officers stopped there." His complaint centers on Mynsberge "explicitly connect[ing] the user/dealer profile to [defendant] by stating his opinion that while the vial's contents were for personal use, the drugs in the bindles were for distribution." Defendant alternatively contends that his trial counsel was ineffective in failing to raise an objection.

We generally review for an abuse of discretion a trial court's evidentiary rulings. *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999). However, defendant failed to preserve his challenge by raising a timely objection. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Our review is therefore limited to plain error affecting the defendant's substantial rights, i.e. error that "affected the outcome of the proceedings" or resulted in the conviction of an innocent individual. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Defendant also failed to preserve his challenge to his attorney's performance by requesting a new trial or an evidentiary hearing, limiting our review to errors apparent on the existing record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). To establish ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant that he was denied the right to a fair trial. *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). The defendant must overcome the presumption that the challenged action was sound trial strategy. *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991). "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996).

## III. ANALYSIS

"[A] prosecutor may use expert testimony from police officers to aid the jury in understanding evidence in controlled substance cases." *Murray*, 234 Mich App at 53, citing *People v Ray*, 191 Mich App 706, 707; 479 NW2d 1 (1991). Such evidence is inherently prejudicial, however, because it suggests that innocent characteristics may be indicative of criminal activity. *Murray*, 234 Mich App at 53. Prosecutors walk "a very fine line between the probative use of profile evidence as background or modus operandi evidence and its prejudicial use as substantive evidence." *Id*. at 54.

In *Murray*, this Court carefully explained the rules governing the admission of drug profile evidence. First, profile evidence must be offered for the proper purpose of providing background information or modus operandi evidence to the jury. *Id*. at 56. "[T]he profile, without more, should not normally enable a jury to infer the defendant's guilt. The prosecutor must introduce and argue some additional evidence from the case that the jury can use to draw an inference of criminality . . . ." *Id*. at 57. Moreover, a drug profile expert may not "opine that the defendant is guilty merely because he fits the drug profile." *Id*. at 54. The expert should not "expressly compare the defendant's characteristics to the profile in such a way that guilt is necessarily implied." *Id*. at 57. And finally, "[a]ttorneys and courts must clearly maintain the distinction between the profile and the substantive evidence." *Id*. One way to accomplish this is to caution the jury regarding the limited use of drug profile evidence. *Id*.

Overall,

difficult as it may sometimes be, courts must take into consideration the particular circumstances of a case and enable profile testimony that aids the jury in intelligently understanding the evidentiary backdrop of the case, and the modus operandi of drug dealers, but stop short of enabling profile testimony that purports to comment directly or substantively on a defendant's guilt. [*Id*. at 56.]

The prosecution and its witnesses crossed the line in this case and used profile evidence for an improper purpose by opining on defendant's guilt. Officer Mynsberge specifically testified that the meth packaged in the nine paper bindles was intended for distribution while the meth in the corked glass vial was for personal use. Officer Kerrigan drew a direct inference of defendant's guilt after comparing the profile evidence to the text messages culled from defendant's phone—that defendant was negotiating the price of meth with a potential buyer. And Lieutenant Platzer expressly opined that the nine bindles "appear[ed] to be a dealer's quantity." This was an improper use of profile evidence and these statements should have been excluded.

The court gave no limiting instruction contemporaneous with the witnesses' testimony as defense counsel failed to object. The court also provided no final instruction to the jury regarding the proper use of drug profile evidence. This too was error.

Despite the improper use of the profile evidence and failure to provide a limiting instruction, relief is not warranted. The vast majority of the profile evidence was offered for a proper purpose. The evidence detailed the method of meth manufacture, how ingredients are collected, the packaging of meth for sale, and the cost of the finished product. The jury could consider that evidence as background information to explain the significance of the physical evidence. Specifically, given the amount of meth found on defendant and that it was divided into nine separate packets, the jury could extrapolate without assistance that defendant intended to distribute rather than use the substance. Moreover, the prosecution presented screen shots of several text-message conversations in which defendant referenced the manufacture of meth and offered to sell the drug to various customers. Given the strength of the properly admitted evidence, we cannot find that the improperly admitted evidence impacted the proceeding's outcome or resulted in the conviction of an innocent man.

Counsel's errors also do not demand relief. Although Mynsberge, Kerrigan, and Platzer improperly shared their opinions of defendant's guilt, defense counsel was not necessarily ineffective in failing to object. "Certainly there are times when it is better not to object and draw attention to an improper comment." *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995). Counsel may have strategically opted against drawing attention to this testimony.

More concerning to this Court is defense counsel's failure to request that a limiting instruction be given to the jurors before they retired to deliberate. M Crim JI 4.17 provides the language for a "drug profile evidence" instruction:

> You have heard testimony from [name witness(es)] about [his / her / their] training or experience concerning other drug cases. This testimony is not to be used to determine whether the defendant committed the crime charged in this case. This testimony may be considered by you only for the purpose of [state purpose for which evidence was offered and admitted].

This instruction clearly should have been requested and given in this case. We perceive no strategy for failing to request its reading.

However, it is unlikely that the reading of this instruction would have altered the outcome of defendant's trial. As noted, significant evidence beyond the police witnesses' opinions established that defendant intended to distribute the narcotics in his possession. Accordingly, a new trial is not required.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Christopher M. Murray
/s/ Karen M. Fort Hood